|103    395|
|108    640|

103    395
113    277

103    395
139    446

EMMA INGHRAM, *et al.*, v. THE NATIONAL UNION, Appellant.

**Appeal:** REVIEW OF VERDICT. Under Code, section 2837, subdivision 6, providing that when a verdict is not sustained by sufficient evidence, or is contrary to law, a new trial can be granted, a verdict will not be disturbed on the ground that it is not sustained by the evidence, unless it is so manifestly against the weight of evidence as to show that it was the result of passion or prejudice.

RULE APPLIED. In an action on a life policy the defense was suicide. Deceased was county clerk. A witness testified that on Sunday morning about nine o'clock he went into the clerk's office, and heard two shots, and on opening the vault door found the gas burning, and deceased's body at the foot of the stairs in the vault, and a revolver, with two empty chambers, lying near. There were two wounds on the body of deceased, one of which was sufficient to cause death. *Held,* that a verdict that deceased did not commit suicide was not supported by the evidence.

**New Trial.** Where a motion for new trial urges that a motion for verdict should have been sustained in spite of a conflict in the evidence, that conflict must be resolved against the moving party. If, then, there is not sufficient evidence to sustain a verdict the motion for new trial should be sustained and, otherwise, overruled.

**Burden of Proof:** SUICIDE. Where the defense to an action on a life policy is suicide, the burden of proof to establish the same is on the defendant.

**Special Interrogatories.** In an action on a life policy, a refusal to submit a special finding, "Do you find that the deceased committed suicide?" was proper, where the defense was suicide, as such finding was directly involved in the general verdict.

SAME: *Accidental death.* A refusal to submit a special finding, "Do you find the deceased was killed by any other person?" was properly refused, as not presenting a controlling issue, for defendant would be liable if the death was by accident, no matter who caused it.

*Appeal from Des Moines District.*—HON. JAMES D. SMYTH, Judge.

THURSDAY, OCTOBER 21, 1897.

THIS action is to recover upon a certificate of life insurance issued by the defendant on the life of W. D. Inghram in the sum of three thousand dollars, wherein the plaintiffs are named as the beneficiaries. The application of W. D. Inghram, which is made a part of the certificate and contract, contains this provision: "I further agree that no benefit whatever shall be paid upon my death should I suicide within two years after becoming a beneficial member, whether at the time of committing suicide I shall be either sane or insane." Question is made in the pleadings as to whether the death of Mr. Inghram occurred within the two years after he became a beneficial member. The court instructed as claimed by the defendant, namely, that the death did occur within two years after deceased became a beneficial member. This was favorable to the defendant (appellant), and it makes no complaint of the instruction; and, the plaintiffs not having appealed, this instruction must be accepted as the law of the case. The only defense pleaded is "that the said decedent died on or about the 14th day of October, 1894, and within two years of becoming a beneficial member of said defendant committed suicide, by reason whereof any and all rights of the said W. D. Inghram and of his family and beneficiaries became and were forfeited." The plaintiffs, in reply, denied these allegations, and herein we have the only issue in the case. Verdict and judgment were rendered in favor of the plaintiffs for the amount claimed, from which judgment the defendant appeals.—*Reversed.*

*Chas. J. Kavanagh, Geo. S. Tracy,* and *Sam'l K. Tracy* for appellant.

*Seerley & Clark* for appellees.

GIVEN, J. — I.     Subdivision 6 of section 2837 of the Code provides that a new trial shall be granted when "the verdict, report, or decision is not sustained by sufficient evidence, or is contrary to law." Appellant moved for a new trial on these grounds, and now complains that said motion was overruled, contending that the verdict is not sustained by sufficient evidence. The only question submitted to the jury was whether or not the deceased committed suicide, and the court instructed that, if the jury found that he did, its verdict should be for the defendant; and, if it failed to so find, it should be for the plaintiffs. The correctness of this instruction is not questioned, and it therefore stands as the law of the case. The verdict being for the plaintiffs, the jury must have failed to find that the deceased committed suicide, and the question now to be considered is whether there is sufficient evidence on this issue of suicide to sustain the verdict. It is a well established rule that the verdict of a jury will not be disturbed by the appellate court on the ground that it is not sustained by the testimony, unless it is so manifestly against the weight of evidence as to show it to have been the result of passion or prejudice. See note to subdivision 6, section 2837, Miller's Code. It is also an established rule that, where the evidence is conflicting, it is the province of the jury to pass upon the conflict, and the courts will not interfere in such cases. See same note. *Meyer v. Houck,* 85 Iowa, 319, does not modify nor change these rules. Under the rule of that case it is the duty of the

judge to direct a verdict "when, considering all the evidence, it clearly appears to him that it would be his duty to set aside his verdict if found in favor of the party upon whom the burden of proof rests." In ruling upon the motion for a verdict or a motion for a new trial on the ground that the verdict is not sustained by sufficient evidence, where the evidence is conflicting, the conflict must be resolved in favor of the party against whom the motion is made, and, if then there is not sufficient evidence to sustain a verdict for that party, the motion, should be sustained, but, if otherwise, it should be overruled. We may say here, however, that in our view of this case, there is no substantial conflict in the evidence bearing upon the issue of suicide, and that the only room for contention is as to the conclusion that should be drawn from this uncontroverted evidence. The instruction referred to above is grounded upon the presumption that where death is shown it will be presumed to have resulted from natural or accidental causes, and not from murder or suicide. The court also instructed,—and correctly so,— that the burden was upon the defendant to establish its defense of suicide. Guided by these rules, we now inquire whether this verdict is sustained by sufficient evidence.

II.   On October 14, 1894, W. D. Inghram was clerk of the court for Des Moines county, which office he had held for several successive terms, and was then the nominee of his political party for election to another term. Defendant sought to prove that charges of defalcation had been made against Mr. Inghram in a daily paper published on the thirteenth and fourteenth days of October, but this was excluded, because no evidence was offered tending to show that Mr. Inghram had knowledge of such accusations. Evidence of an investigation of his accounts after his death was taken

with a view of showing whether or not he was a defaulter. This evidence is quite unsatisfactory, and leaves it doubtful whether he was a defaulter in any considerable sum; and we think it is not very material to the inquiry to determine whether or not he was a defaulter. On Saturday, October 13, 1894, for some cause, Mr. Inghram was not at his office, but left it to the care of his deputy, Mr. Irwin. On the night of the thirteenth, Mr. Irwin closed the shutters to the window in the vault in the office, locked up the vault, turned the combination of the vault, and locked the office. C. C. Fowler, guardian of these plaintiffs, and who was called by them, testifies, in substance, as follows: That on Sunday morning, October 14, 1894, about 10 o'clock, he went into the clerk's office; that while there he heard two shots, ten seconds apart, but was not able to locate them; that he thought they were in the basement, and that on leaving the office he noticed the handle of the safe; that he went into the hall, and from there into the auditor's office, where Mr. Guelich, Mr. Garret, and Mr. Southerland were; that after two or three minutes he spoke to these persons about hearing the shots, whereupon they all went into the clerk's office. These four gentlemen and Dr. Fleming, who was immediately called, substantially agree as to what followed. The found the vault doors closed, with the handle turned, but not locked. Upon opening the door, they found powder smoke in the vault, the window shutters closed, and a gas jet in the vault burning, and turned low. After opening the vault, they heard several groans, but, owing to the darkness, could not see anything in the vault. After procuring a light, they found the dead body of Mr. Inghram at the foot of the spiral stairs in the vault, and a self-cocking revolver, with two empty chamber, lying near the body. The only conflict in the evidence of these witnesses is

as to the distance the revolver lay from the body, some saying that it was two or three feet, and one that it was six or eight feet; but this discrepancy is explained by the fact that the revolver had been taken up and laid down again. They all agreed that the revolver was not in the hand of the deceased. Mr. Irwin identified the revolver found in the vault as being similar to one that had been used on a criminal trial, and that had been put away in the vault, with the loads in it, for preservation, by direction of the deceased. Mr. Irwin was not able to say whether or not this was the identical revolver. Upon removing the body from the vault, Dr. Fleming discovered a gunshot wound, which he says was sufficient to cause death. He says: "I didn't examine carefully enough to find the second wound until the next day. That was right back of the ear." Mr. Unterkircher, the coroner and undertaker, who was also present, observed that there were two wounds on the body at the time it was taken from the vault; "one right back of the ear, and the other in the temple on the right side, right in the hair." It is evident that the wound observed by Dr. Fleming on Sunday was the one in the temple in front of the ear. Mr. Unterkircher says: "When I washed the body, there were no discolorations or powder burns on the hair or body. The hole in the temple showed kind of jagged edges about the size of a lead pencil. There was no singeing of the hair, and no powder burns on either of the wounds. There was no *post mortem* examination had." The defendant also introduced in evidence the verdict of the coroner's jury, which was identified by the coroner, wherein the jury found "that the deceased came to his death by a pistol shot, self-inflicted while in a state of temporary insanity, caused by financial trouble." It is upon this evidence that the defendant relies as establishing the defense of suicide. In rebuttel, the plaintiffs

introduced evidence of which the following is the substance:  Dr. J. W. Holliday, having shown himself qualified as an expert, testified as follows: "A wound inflicted with a 38-caliber revolver through the head, right in front of the hair, is considered a mortal wound; as also a wound made by a revolver back of the ear, and in the hair. * * * Two fatal wounds inflicted on the same individual are generally considered to be done by some one else, and not self-inflicted.  It is not very satisfactory to tell the cause of death from an external examination of the body after death, without making a *post mortem* examination.  Where a wound having been inflicted in the head as was stated, the shot of the first mortal wound would practically make it impossible for him to make the second one, on account of the shock.  He couldn't make the second shot.  The usual effect upon the muscles of the hand holding the weapon in a self-inflicted wound is that the weapon is held tight in the grasp in case of sudden death."  The doctor further testified to the effect that, where the person shoots himself with a pistol held in his hand, there would be powder burns and singeing, unless the weapon was held directly against the body, in which case the powder and ball would go directly into the wound, and there would be no flash outside.  He further said: "I don't pretend to tell the jury that the man shot himself, and did not fire two shots; only give the general rules.  Yes, sir; the general rules have exceptions."  Dr. Fleming identified certain works as standard, parts of which were offered in evidence, and it was agreed that Doctors Stone and McKitterick would testify the same as Dr. Holliday.  The extracts from the standard works offered in evidence sustain the general rule as testified to by Dr. Holliday, and show but little, if anything, in addition, material to this inquiry.  The plaintiff also introduced evidence in rebuttal showing that deceased

"shot left-handed," and that "he couldn't see out of his right eye to amount to anything." This, with the testimony of Mr. Fowler, already noticed, was all the evidence offered in rebuttal.

III.   W. D. Inghram's death was not from natural causes, but from a pistol shot wound or wounds in the head inflicted by himself, accidentally or intentionally, or by another. The present inquiry being whether it was by himself intentionally, we only consider the probabilities or improbabilities of accident or homicide, as they may tend to prove or disprove death by suicide. In our view of the evidence introduced by the defendant, and that of Mr. Fowler, introduced by the plaintiffs, we think that but one conclusion can be fairly and properly arrived at therefrom, and that is that Mr. Inghram's death resulted from pistol shot wounds intentionally inflicted by himself. It is true that the evidence does not clearly disclose a reason for such an act, and that mere conjecture may not be resorted to to find the reason. It is often true that the motive of the suicide is undiscovered; but that is no reason for ignoring established facts in an investigation like this. The time, place, and circumstances of the death, as shown in the evidence before us, seem to be inconsistent with any other conclusion than that of suicide. It was on the Sabbath, and in the seclusion of the vault, where the act was least likely to be interfered with. The four men were at the vault within five minutes after the shots were fired, and found the doors closed, the vault full of smoke, and no person was seen or heard to go from the place. There were no powder marks or singeing, as there would have been had the shots been fired within seven feet of the head, unless the weapon had been against the head. If the shots had been fired by another, it would most likely have been at some distance from the head, yet, because of the size of the vault, within seven feet; and in that case, according

to the testimony, there would have been powder marks
and singeing of the hair. The absence of these is quite
convincing that the death was not by the hands of
another. The fact that there were two wounds renders
the theory of accident highly improbable, for it is diffi-
cult to conceive how the deceased could have acci-
dentally inflicted these two wounds upon himself. It
may be that it would have been impossible for deceased
to have inflicted these wounds "shooting left-handed,"
but Mr. Anderson, who says he shot left-handed, seems
to have observed this when shooting by sight. That,
when shooting by sight he shot left-handed, was prob-
ably because of the blindness of his right eye; but it
does not follow that in the darkness of that vault he did
not shoot right-handed. It seems highly probable that
the wounds were inflicted with the pistol, with the two
empty chambers, found in the vault, and that this is
the pistol that was placed in the vault as stated by Mr.
Irwin. If this is true, it is improbable that it was fired
by another than deceased. The general rules given by
Dr. Holliday and by the authors of the works in evi-
dence are undisputed, but it remains to see their appli-
cation to the facts of this case. The doctor says a
wound inflicted with a 38-caliber revolver through the
head, in front of the hair, or back of the ear, is con-
sidered a mortal wound. He also says that two fatal
wounds inflicted on the same individual are generally
considered to have been done by another, and not self-
inflicted. To apply these rules, let us inquire whether
there was a wound through the head in front of the hair,
or back of the ear, and whether there were two fatal
wounds. Dr. Fleming was the only physician who
examined the body, and he tells us that at the time it
was taken from the vault he found a hole in the front
of his head at the commencement of the hair, which
was sufficient to cause death; and that he did not dis-
cover the wound back of the ear until the next day.

The doctor gives no further description of the wounds. Mr. Unterkircher, the only other witness who gives any description of the wounds, describes the one in the temple as already quoted, but gives no description whatever of the other wound, further than to say that it was back of the ear. No witness says that the wound back of the ear was through the head, that it penetrated the head, or that it was a fatal or mortal wound; therefore that wound does not come within either of the general rules first stated by Dr. Holliday. We may well infer from the fact that this wound was not discovered by Dr. Fleming on his first examination, and is not described other than as we have stated, that it was not a mortal or fatal wound, and that the cause of death was the wound in the temple. This being true, it was entirely possible for the deceased to have inflicted the wound back of the ear, and in ten seconds thereafter to have inflicted the mortal wound in front of the ear; for, under the rule as stated, it is only when two fatal wounds are inflicted that the presumption is against suicide. The reason of the rule is that, having received one fatal wound, the suicide is incapable of inflicting another. It is further stated as a general rule, that "the usual effect upon the muscles of the hand holding the weapon, in a self-inflicted wound, is that the weapon is held tight in the grasp in the case of sudden death." From this it is argued that, as the pistol was not in the grasp of the deceased, the death was not suicidal. If by sudden death is meant instant death, this was not such, for the deceased was heard to groan several times after the witnesses had come to the vault. Whether the weapon would be retained in the grasp would depend upon circumstances,—such as the position of the body at the time the shots were fired, and the manner in which it fell. Deceased was lying at the foot of the spiral stairs, but whether upon the stairs or elsewhere,

when he fell, we do not know. In the face of other facts tending so strongly to show suicide, we think it should not be said, merely because of this one circumstance, that the other facts should be ignored. Another rule relied upon as rebutting the claim of suicide is the absence of powder marks or singeing. Dr. Holliday's testimony shows that where a shot is fired from a 38-caliber revolver at from two to seven feet from the body powder marks will show, but when the revolver is held directly against the head the powder and ball would go directly into the wound, and there would be no flash outside. We have seen that there were no powder marks or singeing about those wounds, and this, we think, is quite convincing, not only that death was not caused by another, but intentionally by the deceased himself, in placing the weapon directly against his head. It may be said that, if this is true, then surely the wound back of the ear penetrated the head; but not necessarily so. Dr. Holliday says: "It is not very satisfactory to tell the cause of death from an external examination of the body after death without making a *post mortem* examination." No such examination was made, and the probability seems to be that the shot back of the ear was fired at such an angle as not to penetrate the head, and that thereupon the mortal wound upon the temple was inflicted. Our examination of the facts leads us to the conclusion that the verdict is not supported by the evidence before us.

IV. Appellant complains of the refusal to give certain instructions asked. We have examined these instructions, and find that the legal principles presented therein were quite fully covered by the instructions given. Appellant also complains of the refusal of the court to submit two special findings to the jury, namely: "Do you find that deceased committed suicide? Do you find that deceased was

killed by any other person?" The first was properly refused, because it was directly involved in the general verdict. The second was properly refused, because it did not present an ultimate and controlling question, as it does not follow that, because the deceased was not killed by another, the appellant would not be liable, it being liable if the death was by accident. For the reasons already stated, the judgment of the district court is REVERSED.