BRIDGET GAVIN v. THE DES MOINES LIFE INSURANCE COMPANY, Appellant.

**Insurance:** SUICIDE: EVIDENCE. In this action upon a life insurance policy the evidence is held to show that the decedent committed suicide.

**Same:** INSTRUCTION. Where a policy of insurance provides that the same shall be void if the insured die by his own act, whether sane or insane, and the action is defended on the ground of suicide, the jury should be instructed as to the effect of such provision in the policy.

**Same:** SUICIDE: SELF DESTRUCTION BY INSANE PERSON: DISTINCTION. There is a distinction between suicide and self destruction when the party is insane; as suicide includes the moral element of intentional self destruction, while an insane man may commit the act without the presence of such moral element.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

THURSDAY, JUNE 16, 1910.

SUIT on an insurance policy. Defense that the insured killed himself. Trial to a jury, and verdict and judgment for the plaintiff. The defendant appeals.—*Reversed.*

*Guersney, Parker & Miller,* for appellant.

*Sullivan & Sullivan,* for appellee.

SHERWIN, J.—In October, 1907, the defendant insured the life of Patrick Gavin in the sum of $1,000, payable to Bridget Gavin, his mother,· the plaintiff herein.    The policy contained a provision as follows: "This policy shall cease and be null and void and of no effect, (1) if within two years from the date hereof the insured shall commit suicide or die by his own hand or act, whether sane or insane at the time."    The insured was killed by a gunshot on the 10th day of August, 1908, and the only fact question in the case is whether he purposely shot himself.

At the time of his death the insured was nearly nineteen years old.    He lived at home with his father and mother, and for nearly four years prior to the 1st of August, 1908, he had been in the employ of a Des Moines firm as a delivery boy.

1. INSURANCE: suicide: evidence.

On the 1st of August he laid off because he was sick, and from that time until his death he remained at home.    The plaintiff testified: That he was not confined to his bed all of the time, but was up and down. That he complained of being ill, but did not say what his trouble was, only that he was run down and tired out.    She said: "He complained of no ache or pain, simply complained of being run down and tired out.  .  .  . His movements were quiet.    He laid still in bed until about eight o'clock, and then he would get up and lay on the sofa and read."    "Some days" he would go back to bed "and some days he did not."  No ·physician had been called for the deceased up to the morning of the 10th of August.    Nor had he taken any medicine during such time, so far as the record discloses.    The plaintiff further testified that "the last few days he looked lots better and pleasanter.    When he was at himself he was strong."    Coming now to the morning of the 10th of August, the evidence touching his condition is substantially as follows:    His

father says that he saw him in his bedroom at about half past seven o'clock in the morning. That "he seemed to sit up in bed, and I asked him was he going to work, and he said he thought he was." The father then left the house, and did not again see his son alive. The plaintiff says as to his condition that morning: "He intended to go to work that morning, and he felt cold he said and told me to put a cover on him, and I did, and later on I went up and straightened up the room. I asked him if he was feeling some better, and he thought he was, and I thought I would not let him lay there sick, I would get a doctor, and I went to Mercy Hospital and the Sisters told me Dr. Priestly was coming, that they expected him, and I told them to send him down. I do not know what time I was last up in his room before going to the hospital. It was after the usual time that he would get up and go to his work. That morning I asked him if he was going to work, and he said he did not think so. He said he was cold and to put a cover on him. He said nothing else. I did not ask him what the trouble was."

The plaintiff and the insured were alone in the house immediately before she went to the hospital and after her return therefrom. She testifies as follows as to what occurred after she returned from the hospital:

I began straightening up the house, and was raveling some ravels that was on the carpet sweeper and I heard a noise that I thought was a neighbor's screen door, and I did not pay any attention for quite a while, and, after a while, I went up and you could smell the powder smoke all over the room, and I went to his room and found him moaning twice. I did not go upstairs until about ten minutes after the noise. I did not go in response to the noise. When I went into the room, he was lying on his right side. The bed was a little from the south wall. The bed was lying east and west. It was not quite into the wall. There was nothing between the bed and the west wall. The dresser was to the east of the bed. I

can not tell whether he was covered up when I went up there. He was lying on his right side, facing the wall toward the south. I put my hand around his head and turned his face toward me, and I thought he smiled up in my face, and that was all. I asked him, I says, 'Patrick, can you tell how it was done?' and I got no answer, of course. I can not tell whether I noticed the wound or not. I afterwards saw where he was hurt. Do not know whether I pulled the cover back over him or not, but I found the revolver lying on the south side of the bed. I took the revolver and laid it on the dresser, did not throw it. I can not say where from the body the revolver was. It may be it would be fifteen inches away from his body.

The plaintiff further testified that she at once called a neighbor, and that the neighbors and officers came; that she did not know where her son's hand was with reference to the revolver, and did not know where his hand was, "whether lying on top of the cover" or not. "I saw the revolver . . . on the covers."

The coroner, a physician, and two or three officers from the police department were at the home soon after the death, and their testimony is, in substance, as follows: Dr. Morris says: "I found the man lying flat on his back about the middle of the bed, his face on the pillow. I know the body was covered, but do not recollect where the covers were. I think it was pulled down over the chest. The wound looked like a bullet wound about an inch above the nipple on the left side right into the heart. The flesh was discolored around the opening." Mr. Newlen, the coroner, testified: That he found the body lying about the middle of the bed on its back. That he found "a hole in the left side above the nipple. I should judge about an inch, directly over the right auricle of the heart. It was burned around the hole in the breast about the size of a half dollar. He had on a thin undershirt, kind of gauze. . . . I looked to see if the bullet had gone

through the body. It had not, and we did not trace the course of the bullet." Witness Jackson testified that the deceased was lying on his back about the middle of the bed, and that the flesh around the wound was discolored. Witness Skinner says that "they turned his undershirt back and it was powder marked all around there, a black space there. The garment he had on had a black spot where it was burned. . . . The body was covered up when I got there." The revolver found on the bed with the insured was one that he had owned for some time and kept in the dresser at the foot of his bed when not carrying it. When taken from the bed, all of the chambers except one contained loaded cartridges, and this one contained an exploded shell.

A separate and careful examination of the evidence leaves no doubt in our minds that this unfortunate young man took his own life. He had been too ill to work for ten days. No physician attended him or prescribed for him. On the morning of his death, when his mother went to his room, he complained of being cold, asked her to place more cover over him, and told her that he would not go to work. He did not get up that morning, and it is evident that he was very ill. It is equally as apparent that the plaintiff was then alarmed over his condition, for she at once concluded that the time had come when a physician must be called to attend him. The plaintiff put additional cover on the bed and went for Dr. Priestly, and while the record is silent on the subject, it is not unfair to presume that she communicated her purpose to her sick boy, for such would be the natural thing for a mother to do. There is nothing in the record to sustain the theory of an accidental shooting, and the only way that it can be sustained is by force of the presumption against the taking of one's own life. But it is almost inconceivable that this sick boy should take his revolver from his dresser to his bed for the purpose of cleaning

it, or amusing himself with it.   He was familiar with the weapon because he had carried it on his person when he was delivering and making collections therefor for his employers.   It was not such a novelty as would prompt him to leave the cover that he had asked his mother for. Furthermore, if he was lying on his back when found, as all of the witnesses, except the plaintiff, say he was, no presumption is strong enough to sustain the claim that the killing was accidental in view of the fact that the shot went directly into the heart, and that the powder burns on the undershirt show that the muzzle of the revolver was pointed directly at the spot where the ball entered the body.   Again, if the testimony of the plaintiff that the insured was lying on his right side when she found him be true, it would be practically impossible to shoot himself in the heart, as was done, without deliberately placing the revolver for that purpose.   It would be a manifest injustice to permit the presumption upon which the plaintiff alone relies to prevail over so many undisputed facts and circumstances showing a deliberate act on the part of the deceased.

This is a stronger case for the 'defendant than either *Beverly v. Supreme Tent,* 115 Iowa, 524, or *Inghram v. National Union,* 103 Iowa, 395, and must be controlled by those decisions.   The cases relied upon by the appellee were decided upon facts unlike those now under consideration.

Another matter that may properly be considered and mentioned in this connection is the fact that the plaintiff at the time expressed her belief that her son had committed suicide.

The policy is made void if the insured die by his own hand or act, whether sane or insane, and the jury

2. SAME: in-    should have been instructed on that provision
struction.    of the policy as requested by the defendant.
It is not an uncommon belief that no absolutely sane

person will destroy his own life.  And, where the policy provides that it shall be void if death be caused by the act of the insured whether sane or insane, an instruction should be given covering such provision.  Nothing was said in the instructions about it, however.  On the contrary, the jury was told all through the instructions that to defeat a recovery the defendant must prove that the insured committed suicide.

The cases generally make a distinction between suicide and self-destruction when insane.  Suicide includes the moral element of intentional self-destruction, while an insane man may commit the act without the presence of such moral element.

3. SAME: suicide: self-destruction by insane person: distinction.

*Scarth v. Security Mutual Life Society,* 75 Iowa, 346; Cooley's Briefs on Insurance, 3248.  The judgment should not stand.  It is therefore *reversed.*