Harriet Wood, Appellee, v. Sovereign Camp of the Wood-
men of the World, Appellant.

**Death:** SUICIDE: ACCIDENT: PRESUMPTION: EVIDENCE. Love of life
is so strong that where there was no witnesses to a death, the result
of a revolver shot, the presumption obtains that it was accidental
rather than suicidal; and this presumption has the force of affirma-
tive evidence and will prevail unless so negatived by the surrounding
facts and circumstances as to leave no other reasonable hypothesis
than that of suicide. In the instant case the evidence is held to
justify submission of the question of whether deceased took his
own life or was accidentally shot.

**Same:** INSURANCE: SUICIDE: BURDEN OF PROOF. Where the certificate
of a fraternal insurance association exempts the association from
liability for a death resulting from suicide it has the burden of
showing that death resulted in that manner.

**Insurance:** SUICIDE: INSTRUCTION. The certificate of insurance involved
provided that the association should not be liable if the insured
committed suicide, whether sane or insane. The association con-
tended that death resulted from suicide, but there was no question
raised as to the sanity of deceased. *Held,* the instruction that
deceased intentionally took his own life must appear to defeat
liability was not erroneous, because ignoring the provision that
suicide while insane would avoid the certificate.

**Same:** SUICIDE: ACCIDENTAL DEATH: CONSTRUCTION OF POLICY. The
provision exempting an insurance association from liability in case
the insured should die from his own hand or act has reference only
to suicidal death, and not to an involuntary or accidental death.

**Same:** INSTRUCTION. Where the court instructed that plaintiff, the
beneficiary, was bound by all the terms and conditions of the con-
tract between deceased and the defendant association, it was a
sufficient charge that plaintiff was bound by the provision of the
certificate exempting the association from liability in case of suicide.

*Appeal from Cedar Rapids Superior Court.—*HON. C. B.
ROBBINS, Judge.

SATURDAY, JUNE 20, 1914.

ACTION at law on a certificate of membership in the
defendant company. Trial to a jury. Verdict and judgment
for plaintiff. Defendant appeals.—*Affirmed.*

*Grimm & Trewin,* for appellant.

*Barnes & Chamberlain,* for appellee.

PRESTON, J.—The petition set out the certificate which
was issued to the deceased, Samuel Wood, the fact that de-
ceased came to his death about August 12, 1911, and that
the defendant had waived proofs.

The answer admitted all the allegations of the petition,
and that plaintiff would be entitled to recover but for the
fact that deceased committed suicide, contrary to the terms
of the application, certificate, and constitution and by-laws
of the order, which provided, in substance, that in the event
of death of the deceased by his own hand or act, whether
sane or insane, the certificate should be void.

The only issue in the case, and the only one submitted to
the jury, was as to whether or not the said deceased came to
his death by his own hand or act. The errors assigned relate
to the sufficiency of the evidence to sustain the verdict, the
refusal of the court to give instructions requested by the
defendant, and to the giving of others by the court on its
own motion. The point most strongly urged is the one first
above mentioned.

Because of the presumption that from love of life men
will not inflict death upon themselves, the trial court held
that defendant had the opening and closing. Defendant as-
sumed the burden and proceeded to introduce its testimony.

There was no eyewitness to the act of shooting. It is the contention of the defendant that the circumstances show that the defendant committed suicide, and that the evidence is so clear and strong that there can be no other reasonable hypothesis or theory as to the cause of death, and that this court should so say.

The plaintiff claims that the facts shown are consistent with the theory of accidental shooting, and that the defendant had not overcome the presumption, or at least that it was a question for the jury to say whether the presumption and the circumstances tending to indicate an accidental shooting had been overcome.

As to many of the facts there is no substantial dispute. In the application for membership deceased stated, in answer to an inquiry as to his family history, that his father committed suicide; that the father bought stolen property unknowingly and was about to be placed under arrest and killed himself.

Deceased was at the time of his death superintendent of city parks of Cedar Rapids and had been such for more than a year. Deceased had had a revolver ever since he was superintendent and carried it a considerable part of the time. He carried it in the daytime on account of the dogs worrying the deer, and at night because he was a police officer. A few days before his death he went to Kansas City to a park convention, and returned on Friday morning, the day before his death, and on the morning of his return read an article in the paper in regard to supposed misconduct of a park employee, who was not named. A complaint had been lodged with the city council in regard to the conduct of the deceased by some woman who claimed that he had ill treated her by separating her from her escort and putting them out of the park; that he had scolded her; that she cried; and that deceased had made an improper proposal to her. After reading the article in the paper, deceased called up the mayor on

1. DEATH: suicide: accident: presumption: evidence.

the telephone, and deceased was informed that there was such a complaint, and that an investigation would be had when one of the park commissioners returned. On Friday deceased talked with different ones about the matter and seems to have been somewhat concerned in regard to it. One witness testifies that deceased said to him, in speaking about the newspaper article:

'If it's me, it must have been that time a few days ago when I chased that couple out of the park what has done nuisance in front of the park,' and said he wouldn't care so much just for himself if it had not been for his wife and boy, and that he thought these people he had driven out of the park had laid a snare for him.

Deceased said that he would fight the matter to a finish, and a witness says he expressed no fear of the charge or of an investigation. When deceased went to Kansas City, he gave the revolver to his son, a young man about twenty years of age, and told him to take care of it and clean it up; during his father's absence the son kept the revolver in his bedroom under the bed. The revolver was loaded, and the son did not clean it. Deceased went to bed about 9:30 o'clock Friday night, saying that he had lost sleep the night before while traveling. His widow gives an account of his conduct during the night substantially as follows: That she went to bed between 9 and 10 o'clock, and her husband was then asleep. That he got up about 12 o'clock the first time and was looking through the window. He stated that he thought he heard some one around. She told him there was no one, and he went back to bed. About a quarter to five he got up again and said he heard some one. She told him there was no one around, it must be the horses in the barn, and he said all right. She thought he went back to bed again, and she says he went to sleep so far as she knows; she got up about 6:30.

The son testifies: That he went to bed about 9:30 or 10 o'clock and slept until five in the morning, when his father

came into his room, but did not say anything about the revolver, and, so far as the son knew, it remained under his bed; he did not know when his father got it. That his father stayed in the room three or four minutes and seemed satisfied and went back to bed. He says, further, that when his father came into his bedroom he said he thought there was some one around the house; the son told him there was nobody around, that it was his window curtain flying loose and flapping against the window; that he got up about 7 o'clock and went downstairs, where his mother was preparing breakfast; that his father was not up yet; that he made no examination to see whether or not the revolver was still under his bed. The son says the hammer of the revolver acted very easily. He also testifies that after he got up in the morning he did not hear his father go to his (the son's) room, and that he would have heard him if he had done so. The revolver was a .32 caliber, three-inch barrel, double action, self-cocking revolver, of the Iver-Johnson make.

After Mrs. Wood got up and went downstairs to prepare breakfast, she made some coffee and took it upstairs to deceased; deceased complained of feeling tired, and that he had lost sleep on the train, she advised him to lie in bed a little longer He drank half the coffee, and that was the last she saw of him alive; she did not go upstairs again until after she had heard the shot.

The son testifies, in substance, that he had started to eat his breakfast when he heard the shot and went upstairs and found deceased on the bed, not in the center, a little more to the side, with his head partly through the rods of the bedstead; he did not notice where the hands of deceased were; he remained there an instant, long enough to see that his father was shot; that the right temple of deceased was towards the outside edge of the bed; that the mother was at the foot of the stairs and came up at once, and the son called Mr. Mashek, who came in about five minutes; that Mr. Mashek drew the body of deceased down on the bed, so his head would

not hang back between the rods of the bed, and put a pillow under his head. The son says that when he first went up the blood was running out of the wound and over the face and beard of deceased.

Mr. Mashek says that when he came in he inquired of Mrs. Wood as to what was the matter, and she said that her husband had killed himself; that when he went upstairs deceased had on a union suit, and his head was between the bars at the head of the bed hanging down as far as the shoulders would permit; blood was running from the wound on the right side and coming out of his mouth and nostrils; that when he got there the deceased moved his chest, but was not conscious; that he pulled the body of deceased down so it would lie straight, and so his head would rest on the bed, and that soon after they found a revolver under Mr. Wood, a little back of the crotch; that was after they had pulled the body down on the bed.

There were four loaded cartridges and an empty shell in the revolver. The hammer was down on the shell. The wound was in the right temple, well towards the front. One witness describes it as about an inch or three-quarters of an inch back from the eye.

There is some difference of opinion as to the appearance of the eyes. Some claim that they were bulged considerably, others not so much. From the appearance of the wound, it seemed to go straight in, as some of the witnesses put it. There is a sharp conflict in the testimony as to whether there was a discoloration or powder marks around the wound in the temple. The coroner testified that:

Around the edge—right around the outside edges of the wound, it appeared to be burned a little. I couldn't say the flesh was scorched; but it was discolored a little. Q. State whether or not it had the appearance around, close in the wound, of being blackened. A. It had; yes, sir. Q. As though by powder marks? A. Slightly; yes, sir.

Other witnesses testified that they observed the skin around the wound had been burned with powder.

Witnesses for plaintiff, and perhaps the larger number, testified that they observed the wound, and that they saw no evidence of powder marks or discoloration. As to the conflict at this point, it was clearly a question for the jury.

An expert, testifying for defendant, gave testimony as to his familiarity with firearms, powder marks, and as to experiments made by him by firing a revolver into the head of an animal at different distances, and was asked:

Q. Assuming that Samuel Wood was found in bed the morning of August 12, 1911, with a bullet wound in his right temple, about an inch, or such a matter, back of the eye, and around this bullet wound there appeared, the skin appeared to be blackened for about half an inch each side of the hole or wound, and not otherwise blackened, and that the wound was somewhat seared, or having the appearance as though it were somewhat burned, from your experience, and your practice, and your experiments, and your knowledge of the subject, how close would you say the muzzle of the revolver was to his head at the time the shot was fired? A. Pressed against his head.

He also stated that the effect of such a wound would be instant death, or practically so, and that deceased would not be able to walk, or to get up off the floor onto a bed after receiving the wound.

Such is the substance of the testimony, stated somewhat in detail, but as briefly as possible. The theory of the defendant is that the motive for committing suicide was the charge against him as to his supposed misconduct with the woman in the park. It is argued for appellant that the presumption against suicide is rebuttable, and that where, by a fair consideration of the testimony, it appears to be rebutted, it is the duty of the court to direct a verdict for the defendant; that where, upon the whole record, the testimony clearly points to suicide, and is inconsistent with any other theory,

a verdict for the defendant should be directed; and cites the following authorities in support of the proposition: *Johns v. N. W. Mut. Ins. Co.,* 90 Wis. 332 (63 N. W. 276, 41 L. R. A. 587) ; *Hardinger v. M. B. A.,* 72 Neb. 860 (101 N. W. 983, 103 N. W. 74) ; *Sovereign Camp v. Hruby,* 70 Neb. 5 (96 N. W. 998) ; *Clemens v. Royal Neighbors,* 14 N. D. 116 (103 N. W. 402, 8 Ann. Cas. 1111) ; *Ingraham v. Nat. Union,* 103 Iowa, 395; *Voelkel v. Supreme Tent,* 116 Wis. 202 (92 N. W. 1104) ; *Hart v. Trustees,* 108 Wis. 490 (84 N. W. 851) ; *Agen v. Life Ins. Co.,* 105 Wis. 217 (80 N. W. 1020, 76 Am. St. Rep. 905) ; *Richey v. W. O. W.,* 163 Mo. App. 235 (146 S. W. 461) ; *Gavin v. Insurance Co.,* 149 Iowa, 152.

In the *Agen* case, *supra,* it was said:

Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case; but the question should be decided by the trial court as one of law.

Appellee finds no fault with the propositions of law just stated.

Appellant also contends that the facts in the instant case more strongly show self-destruction than in the following Iowa cases: *Beverley v. Supreme Tent,* 115 Iowa, 524; *Ingraham v. Nat. Union,* 103 Iowa, 395; or *Gavin v. Insurance Co., supra*—and insists that the *Gavin* case is very much like the present one on the facts.

We shall not compare the facts in the present case with those cited; but, because of the claim that the instant case is so like the *Gavin* case, we shall refer to the opinion in that case. In that case there seems to have been no dispute as to the flesh being burned around the wound. The revolver was kept in the dresser drawer, and the evidence did not show any occasion or reason for taking it from the dresser. The

circumstances were such that he would not be likely to get up and get it for the purpose of examining it. From the position of the body and the character of the wound, it would have been impossible to shoot himself as he was, without deliberately placing the revolver for that purpose. In short, the court said that there was nothing in the record to sustain the theory of accidental shooting.

In the instant case deceased was in all probability sitting up in bed, possibly on the edge of the bed, when shot. It is difficult to satisfactorily account for the bullet wound in the temple, and going straight in, as some of the witnesses say, on the theory of accident. But this is often the case, and was so in some of the cases cited where a verdict and judgment against the insurer was sustained. There are many ways in which people are shot. No one knows how this man was injured. It is possible that he was shot, as he was, accidentally, and it may have been so. The presumption that it was has the force of affirmative evidence, and, unless so negatived by the surrounding facts and circumstances as to leave no other reasonable hypothesis than that of suicide, such presumption will be allowed to prevail, and a verdict founded thereon will not be set aside for want of evidence. *Stephenson v. Insurance Co.*, 108 Iowa, 637; *Lindahl v. Insurance Co.*, 100 Minn. 87 (110 N. W. 358, 8 L. R. A. (N. S.) 916, 117 Am. St. Rep. 666).

Defendant has the burden to so show: In the case at bar deceased had been in the habit of carrying a revolver as an officer. He had left it with his son to be cleaned. He 2. SAME: insurance: suicide: burden of proof. may have gone to his son's room in the morning to examine it to see if the son had cleaned it as directed. It may have been accidentally discharged while he was examining it. It worked easily. Or he may have obtained it from his son's room because he thought there was some one around the house. The evidence shows that there was a noise by the curtain in the son's room. The jury could have found that there were no powder marks

around the wound. It does not appear that deceased had ever expressed or indicated any suicidal purpose or intent.

These are some of the circumstances against the theory of suicide. We are of opinion that, under all the facts and circumstances, there was a jury question. We would not be warranted in bending or breaking the rule simply because there is difficulty in explaining just how deceased met his death.

Appellee cites the following cases, where verdicts for the insured were sustained: *Van Norman v. M. B. A.,* 143 Iowa, 536; *Tackman v. Brotherhood,* 132 Iowa, 64; *Stephenson v. Bankers' Life, supra; Boynton v. Equitable Life Assurance Co.,* 105 La. 202 (29 South 490, 52 L. R. A. 687) ; *Knights Templar v. Crayton,* 209 Ill. 550 (70 N. E. 1066). In some of these the circumstances indicated suicide as strongly as do the facts in this case. It is unnecessary to discuss the facts of those cases. Each case must be decided upon the facts and circumstances thereof.

II. Instruction No. 8½ is criticized. The substance of this instruction is that, in considering whether or not deceased came to his death by his own hand or act, you are instructed

3. INSURANCE:
suicide : in-
struction.

that, in order to avoid the certificate of insurance, the act must be intentional, and not involuntary or accidental.

The objection to it is that the jury might have believed from the evidence that deceased was insane, and that, being insane, he could not be guilty of intentionally taking his own life; that the instruction entirely eliminated the word "insane" from the certificate. Appellant cites *De Gorza v. Insurance Co.,* 65 N. Y. 232; *Clarke v. Assur. Soc.,* 118 Fed. 374 (55 C. C. A. 200) ; *Tuttle v. Association,* 132 Iowa, 652.

In the last case, which was an action upon an accident policy in construing the words "accidental means," the court said, if the act of the assured "causing death sprung from an insane impulse of a disordered and unsound mind, it was neither voluntary nor intentional." But we think it is a suf-

ficient answer to appellant's contention at this point to say that in the case at bar there was no claim of insanity in the evidence, or otherwise, by either party, so that the question of the killing while insane, being unintentional, was not in the case.

The court, by this instruction, was simply instructing the jury in accordance with the theory of the trial, and that was whether the death was by suicide or whether it was the result of an accident. Furthermore, the matter of insanity was covered by instructions 4 and 5. The court also instructed the jurors that they should decide the case solely upon the evidence introduced upon the trial and be governed by the instructions, and that they should permit nothing else to influence or prejudice them. It is presumed the jury obeyed the instructions. Under all these circumstances, we should be slow to believe that the jury considered the question of insanity at all.

We do not understand appellant to claim that, if deceased was shot by his own hand accidentally, the defendant would not be liable. It seems to be the rule that the words "by his own hand or act," as used in insurance con-

4. SAME: suicide: accidental death: construction of policy.

tracts, cover only suicidal deaths as distinguished from involuntary or accidental deaths, even though the actual physical act causing death was by the hand of the insured. 4 Cooley's Brief on Insurance, 3241-3243; *Knights Templar v. Crayton*, 209 Ill. 550 (70 N. E. 1066); *Insurance Co. v. Hazelett*, 105 Ind. 212 (4 N. E. 582, 55 Am. Rep. 192); *Mutual Life Ins. Co. v. Wiswell*, 56 Kan. 765 (44 Pac. 996, 35 L. R. A. 258); *Brignac v. Insurance Co.*, 112 La. 574 (36 South. 595, 66 L. R. A. 322); *Courtemanche v. Sup. Court I. O. O. F.*, 136 Mich. 30 (98 N. W. 749, 64 L. R. A. 668, 112 Am. St. Rep. 345).

III. In instruction 3 the jury were told, in substance, that the provision in the contract as to suicide was binding upon

both the assured and the defendant. It is said the court should have said, also, that it was binding on the plaintiff, the beneficiary. We think the court did so say. In this same instruction No. 3 the court said that the contract provided that, if deceased should die by his own hand or act, whether sane or insane, his certificate should be null and void, and there should be no liability on the part of the defendant society therefor.

5. SAME: instruction.

In the fourth instruction the court said:

That the sole and only issue in this case for your determination is: 'Was the death of the insured, Samuel Wood, caused by his own hand or act, whether sane or insane?' If, therefore, you find from the evidence that Samuel Wood came to his death by his own hand or act, whether sane or insane at the time, your verdict must be for the defendant, etc.

And in instruction No. 2 the court expressly told the jury that the provisions of the policy or certificate were binding on the plaintiff, in this language:

. . . And the plaintiff in this case is bound by all the terms and conditions of the contract made by the said Samuel Wood with the defendant society.

Requested instruction No. 5 is covered by the sixth instruction given by the court, and offered instruction No. 6 is covered by those given.

There was no error, and the judgment is—*Affirmed.*

LADD, C. J., and EVANS and WEAVER, JJ., concurring.