LOUIS Z. GREEN, Appellant, v. NEW YORK LIFE INSURANCE COMPANY, Appellee.

**INSURANCE:** Action on Policy—Defense of Suicide. On the issue of death by suicide, the insurer must so negative the presumption that death was accidental as to leave no other reasonable hypothesis than that of suicide. Evidence held to show suicide.

*Appeal from Linn District Court.*—F. F. DAWLEY, Judge.

MAY 11, 1921.

REHEARING DENIED OCTOBER 1, 1921.

ACTION to recover on a policy of insurance. Defenses were interposed that the insured committed suicide, and that certain answers made to the medical examiner by the insured were false. The trial court directed a verdict for the defendant. Plaintiff appeals.—*Affirmed.*

*Don Barnes* and *J. U. Yessler,* for appellant.

*Stipp, Perry, Bannister & Starzinger* and *Grimm, Wheeler & Elliott,* for appellee.

FAVILLE, J.—On the 24th day of April, 1917, the defendant insurance company issued a policy of insurance in the sum of $3,000 upon the life of one Robert J. Balous. The wife of the said insured was made beneficiary in the said policy of insurance, and has assigned her rights therein to the appellant. The said Balous died on the 2d day of April, 1918. The policy of insurance contained the following provisions:

"*Self-destruction.* In the event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by the company, and no more."

The appellee company tendered and offered to pay the amount of the premiums that it has received from the insured, and specifically alleged in its answer that the said Balous died by suicide.

The insured was 38 years of age at the time of his death. He had been married for about 20 years, and had one daughter, 19 years of age, and his family consisted of himself, his wife, and this daughter. He owned his own home in Cedar Rapids, and since early manhood had been employed as a carpenter, until within about a year prior to his death, when he engaged in conducting a soft-drink parlor in the city of Cedar Rapids. His

family life was agreeable and pleasant, and he was on affection-
ate terms with his wife and daughter. In addition to his home,
he owned some vacant lots in the city of Cedar Rapids, and the
stock of goods used in his business. He had an automobile and
some Liberty bonds, and was out of debt, and his business was
reasonably prosperous.

His wife and daughter testified that he was a man of good
spirits. His wife testified that there had been some change in
the insured's weight and in his personal appearance in the last
two or three years; that he had picked up a good deal, and felt
better than he had when he was working at his trade as a car-
penter. She said that the indoor work was better for him than
the outdoor work; that, when he worked outdoors, he was sub-
ject to colds; that once in a while he would complain of his
stomach, and once in a while he had a headache.

A witness who had known the insured about 24 years, saw
him almost every week, and had been on a bowling team with
him, testified that the insured had the appearance of a healthy
man, and had told the witness that his business was good.

Another witness testified that he saw the insured during
the last year or so of his life, two or three times a month; that
he was "kind of a free, lively disposition, and bright;" and
that he never complained to the witness regarding his health.

Another witness testified that he had seen the insured fre-
quently during the last three or four years of his life, and that
he was an energetic, bright man, and appeared to be in splendid
health. He had not seen him often within the last year.

One of the employees of the insured testified that he had
been acquainted with him for four or five years, and that he
appeared to him to be jovial and healthy; that it was his custom
to come to work between 10:30 and 1 o'clock.

Another witness testified that he had been acquainted with
the insured for about eight years, and that he seemed to be a
man in good spirits and feeling well.

The appellee offered testimony of a witness whose place of
business was located near that of the insured, and who testified
that he had a conversation with the insured, three or four days
before his death, in which the insured told the witness that he
had gallstones, and that he was worried. The witness said he

thought the insured said something about having an operation, which was worrying him; and the witness told the insured that he, the witness, had felt for a long time that he also had gallstones, and that there was nothing to worry about.

Another witness for appellee testified that he had known the insured for about six months, and was in his place frequently; that he had a conversation with him, three or four days before his death; and that insured said to the witness that he was all right, only had a few things on his mind that he wished were off; and, in reply to an inquiry as to what was the trouble, said, ''I got to have an operation performed for gallstones;'' and that, the day before his death, about 3:30 to 4 o'clock in the afternoon, he told the witness that he was going home,—that he didn't feel good.

A physician testified that he was called to treat the insured, some time during the year 1916; that, when he arrived at the insured's house, he found that he was not suffering, but the physician was informed that he had had a bad attack, and had suffered a good deal. The physician testified that he had been phoned for, and that, before he arrived, the insured had had a vomiting spell, but that, when he got there, the insured was feeling much better; that he informed the insured that it was impossible to tell what the trouble was, that it might have been an attack of acute indigestion, and that he might have gallstones or trouble with the gall bladder. He said that thereafter, up to the first of the year 1917, the insured came to his office a few times, and complained of stomach trouble; that he gave the insured medicine to relieve his condition, and told him that, if he had gallstones, he would never get well until he was operated on. The physician said he did not know when this conversation took place, and that he told him this half in earnest and half jokingly.

Another witness for the appellee testified that he was acquainted with the insured, and had a conversation with him in 1915, when he was working for the witness, and was off a day or so on account of illness, and on his return stated to the witness that he thought he was having some trouble with his gall bladder and stomach.

The appellee also offered a witness who was at the home

of insured immediately following the shooting, and he testified that, at that time, the wife of the insured stated that she did not understand why he should shoot himself, and that she had urged him to go to the hospital and undergo an operation for gallstones, to relieve his suffering; that she said she was heating cloths to apply to him to relieve his pains, and he went upstairs while she was heating the cloths, and she heard the shot, and found him there.

A neighbor lady testified that she was at the home immediately after the shooting, and that, at that time, the wife of the insured said that he had been suffering during the night; that he had gallstones, and had been troubled with them that night, and that he did not sleep the first part of the night because he was sick with gallstones; that he had been up once in the night; that he had been troubled with gallstones for quite a while; and that she was going to get some hot water for him, to relieve him that morning. She said she wished that he had had the operation, because it would have relieved him; that he did not care to have the operation, did not want to have an operation; that he dreaded an operation, and he was afraid of an operating table; that he was afraid that he would never come off alive if he got there; that she said the insured was not feeling well when he went upstairs, and was complaining of the old trouble.

Another witness testified that she was present at the Balous home the morning of the shooting; that at said time the wife of the insured said that he was bothered with gallstones, and talked of an operation, and that he feared it.

Another witness testified that he was at the house the morning of the shooting, and that the wife of the insured said that he had complained of ill health, and that the night before the shooting, he had been suffering some, and had been complaining some that morning; that she said he complained of his headache or stomach trouble, or pain he had some place, and she was going to fix up some hot water for him; that she said that he had been examined, and that they had pronounced an operation necessary for gallstones, as the witness remembered it, and that the insured had appeared hostile to the operation.

The wife of the insured testified that she and her husband

had breakfast together, the morning of the shooting, near 8 o'clock, after the daughter had gone to school; that she did not see anything unusual in his actions or appearance; that, when she got up to wash the dishes, he came to the sink, and said that he would dry them for her, and she replied that she could get along with the dishes, and for him to go upstairs and lie down; that he went upstairs; and that, in two or three minutes, she heard the shot. She said he frequently went upstairs after breakfast and lay down, when he had been out late at night.

Immediately after the shooting, the wife ran upstairs, and found the insured lying on the floor. The evidence shows that the bedroom in which the insured was shot contained a dresser with a large mirror in it. This dresser was located across the southeast corner of the room, and there was a bed on the west side of the room. The insured was found lying on the floor in this bedroom, in front of the dresser, with his feet toward it, and his head toward the northwest. There was a gunshot wound in the head of the insured on the right side, located as being above the right ear, near the hair line, about the middle of the right side of the head, near the temple or top of the temple, a little to the front of the right ear. It was a hole such as a 32-caliber bullet would make, and it appeared as if the bullet had entered on the right side of the head and had gone out on the left side.

There is some conflict in the evidence as to whether the wound on the left side of the head was higher or lower than the wound on the right side of the head. The coroner testified that there were powder marks upon the wound in the right temple, and that, in his opinion, the gun was held two or three inches from the head.

The revolver was found lying between the legs of the insured. His right hand was covering the revolver, and lying along his right knee, between his legs. There were three cartridges in the revolver; one of them was empty, and the other two were loaded. The empty shell was between the two loaded shells. The revolver was an old one, which the insured had had for many years, and was kept in the dresser drawer, in the bedroom, with a few other things. The revolver was defective. The coroner testified that there was something the matter with

the trigger, that it could not be shot off until the trigger was pushed ahead.

In the pocket of the clothing worn by the insured, after the body had been removed, there was found a note, which read as follows:

"There is about $650 in the safe and John Fitz has $25 for the cash register. I also loaned Fitz $20.45. It is on the book."

An employee testified that he had known the insured to write out memoranda similar to this one, and to put them in the cash register, or leave them in various places. He did not know that he had ever seen him put such a memorandum in his pocket. He also testified that the insured kept a book of accounts, and that he generally wrote the same up in the evening.

About 5 o'clock in the afternoon preceding the day of the tragedy, the insured had a conversation with a witness in regard to the building of a small garage on one of his vacant lots. The witness testified that, at that time, the insured appeared to feel well, and told the witness to come up in the morning and they would talk it over; and that he supposed the insured meant for him to come to the vacant lot in the morning, which he did; and, not finding any lumber there, and the insured not being present, he went down to his house, and arrived there about 10 o'clock. The wife testified that the insured told her he was going to get up early that morning and go to his lot and build a garage; that he had hired the witness Dudek to help him that day.

The wife of the insured did not deny the statements attributed to her by other witnesses on the morning of the shooting.

Upon the foregoing record, which is the substance of the entire testimony on the subject, it is claimed that the court erred in directing a verdict in favor of the appellee on the ground that the evidence establishes that the insured came to his death by suicide. Cases where the defense of suicide is interposed to an action brought on an insurance policy have frequently been before the courts. It is obvious that no two cases can be identical in their facts, and a single distinguishing item of evidence may be of very great importance. It is well for us, however, to examine a few general rules applicable to cases of this kind.

In such actions, where it appears without dispute that the

insured was killed by external and violent means, the law raises the presumption that the injury was the result of accident, and this presumption must be overcome by evidence. The burden is on the insurance company to show that the accused committed suicide. *Inghram v. National Union,* 103 Iowa 395; *Stephenson v. Bankers Life Assn.,* 108 Iowa 637; *Wood v. Sovereign Camp, W. O. W.,* 166 Iowa 391; *Michalek v. Modern Brotherhood,* 179 Iowa 33; *Utter v. Travelers' Ins. Co.,* 65 Mich. 545 (32 N. W. 812). In the case of *Stephenson v. Bankers Life Assn.,* supra, we said:

"There is a presumption in favor of the theory of accident. This presumption has the effect of affirmative evidence, and, unless so negatived by the surrounding facts and circumstances as to leave room for no other reasonable hypothesis than that of suicide, such presumption will be allowed to prevail, and a verdict founded thereon will not be set aside for want of evidence."

The same rule was recognized and announced by us in *Wood v. Sovereign Camp, W. O. W.,* supra, and also in *Michalek v. Modern Brotherhood,* supra. The writer of this opinion does not agree with the declaration that the presumption of accident is "affirmative evidence," or that it should be treated as such, or that juries should be instructed that this presumption is affirmative evidence. It is nothing more nor less than a presumption which the law raises, and which is rebuttable and which can be overcome by proof. The writer rather agrees with the statement that:

"Such presumption is not evidence, and cannot be treated as evidence by the jury in reaching a verdict, and an instruction that such presumption has the effect of affirmative evidence is erroneous." *Modern Woodmen of America v. Kincheloe,* (Ind. App.) 93 N. E. 452.

See, also, *Prudential Ins. Co. v. Dolan,* 46 Ind. App. 40 (91 N. E. 970); 4 Wigmore on Evidence, Sections 2485, 2487, 2491; *Vincent v. Mutual R. F. L. Assn.,* 77 Conn. 281 (58 Atl. 963); *Scarpelli v. Washington Water Power Co.,* 63 Wash. 18 (114 Pac. 870).

However, it is clear that the burden rests upon the defendant to establish that the death was the result of suicide, rather than accident, and that the evidence to overcome the presumption

of death by accident must be such "as to leave no other reasonable hypothesis than that of suicide." *Wood v. Sovereign Camp, W. O. W.,* supra. We have also held:

"To defeat her recovery, the defense was required to prove its theory of suicide, and this it cannot be said to have done, no matter how strong or persuasive the showing, unless it goes to the extent of eliminating every theory of death otherwise than by suicide." *Michalek v. Modern Brotherhood,* supra.

In *Agent v. Metropolitan L. Ins. Co.,* 105 Wis. 217 (80 N. W. 1020), it was said:

"Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial court as one of law."

This statement was approved by us in *Wood v. Sovereign Camp, W. O. W.,* supra.

Applying these rules to the instant case, we are met with this proposition: Do the facts disclosed by the evidence so negative the presumption that death was accidental as to leave no other reasonable hypothesis than that of suicide? If it could fairly be said that, under all the evidence, the minds of reasonable men might differ as to whether the insured came to his death by accident or by suicide, then it was a question for the jury. But, on the other hand, if all fair-minded men would agree that, under the evidence offered, the death of the insured was the result of suicide rather than of accident, then the court should so hold, as a matter of law.

In determining whether or not the insured committed suicide, the first inquiry that naturally arises is whether or not there was any motive for him to take his own life. As a general thing, men who are sane do not commit self-destruction unless some tragedy or disaster, physical, financial, or mental, has come upon them.

Our first inquiry is, therefore, Was there any motive for the insured to take his own life? The evidence of various witnesses shows that, for some time, the insured had been in a state of

ill health, and had been under treatment by a physician for stomach trouble. It was at least suspected that he had gallstones. He had been informed that, if he had gallstones, he would be compelled to undergo an operation. The declarations of his wife, made at or about the time of the shooting, are significant. It is also of significance that she nowhere denies the statements testified to by these various witnesses. She merely says that she does not know who came in or what went on after her husband was discovered. It is very natural that, at that time, even though excited and distressed, she should have made an explanation in regard to his death, and the fact that it was made without time for deliberation is of significance. From these declarations, it is very apparent that, on the morning in question, the insured was suffering from what he believed to be an attack of gallstones; that he had been ill during the night before, and had not slept well, and had been up in the night; that his wife had urged him to go to the hospital and undergo an operation; that he had declared that he did not care to have an operation, that he did not want it, was afraid of it, and afraid that he would never come away alive, if he went to the hospital. His wife suggested to him that he go upstairs, and that she would heat some water and bring it to him, to relieve him. There was evidence that there was a teakettle of water on the stove, which she said she was getting ready for him, and that there was a hot-water bottle there.

Immediately after the talk with his wife, he went to the bedroom; and, inside of three or four minutes from the time he left the kitchen, she heard the report of the revolver. Unless the insured intended to take his own life, there is no explanation whatever as to why, under these circumstances, he should have gone to his bedroom and taken this revolver out of the drawer of the dresser and attempted to do anything with it. There was nothing to indicate why he should have had any occasion whatever to examine or handle the revolver at that time, except to kill himself. He had not lain down on the bed. The position in which he was found, and the nature and character of the wound, are more convincing yet of the fact of suicide. There was a large mirror in the dresser. The position of the body was such that it is apparent that insured had stood in front of the

dresser and looked into the mirror, at the time he aimed the fatal shot. A very significant and convincing fact is the location of the wound in the head. It is almost inconceivable that a wound of this kind could have been inflicted by the accidental handling of a revolver. Under the undisputed evidence, the weapon must have been held two or three inches from the right temple. For what purpose could the insured have had the re- volver in this position and accidentally have discharged it?

Furthermore, the evidence shows that the revolver was de- fective in regard to the spring in the trigger, so that it could not have been discharged until the trigger was moved forward; and that the insured was familiar with the use of this revolver, had owned it for nearly 20 years, and had repaired it himself, but a short time before his death.

The note found in his clothing, referring to the amount of cash in the safe and in the register, and also to his loan to the employee, is of some significance in connection with the thought of deliberate self-slaughter.

It is true that against this testimony is the testimony of the wife, the daughter, and some acquaintances of the insured, to the effect that he was in apparently good health, so far as they had observed; that his family relations were pleasant; that he was not in financial distress; and that, the day before his death, he had made arrangements to build a garage on that day. The fact that, to casual observers or acquaintances, the insured may have appeared to be in good health has but slight signifi- cance on the question. It is a matter of common knowledge and experience that a person may, in fact, suffer with a malady without having any external manifestations that would be ob- servable to the ordinary person.

In support of the proposition that the cause should have been submitted to the jury, the appellant cites *Van Norman v. Modern Brotherhood*, 134 Iowa 575; *Tackman v. Brotherhood of Am. Yeomen*, 132 Iowa 64; *Stephenson v. Bankers Life Assn.*, 108 Iowa 637; *Michalek v. Modern Brotherhood*, supra. In all of these cases we held that, under the facts disclosed, the ques- tion as to whether or not the insured committed suicide was a question for the jury. We find no conflict between our holdings in these cases and our holding in the instant case. Each case

must be determined by its own particular facts. The physical facts surrounding the tragedy, the position of the body and of the revolver, the location and character of the wound, the fact that the revolver was held close to the temple, the fact that, because of its condition, it could not be discharged easily, the belief of the insured as to his physical condition and the imminent necessity for a surgical operation, and all the facts and circumstances surrounding the case, as shown by the record, lead clearly and convincingly to the irresistible conclusion that the insured committed suicide. Under such conditions, it was the duty of the trial court to direct the jury to return a verdict for the appellee.

As bearing on our conclusion, see *Gavin v. Des Moines L. Ins. Co.*, 149 Iowa 152; *Beverly v. Supreme Tent*, 115 Iowa 524; *Inghram v. National Union*, 103 Iowa 395; *Voelkel v. Supreme Tent*, 116 Wis. 202 (92 N. W. 1104); *Clement v. Supreme Lodge*, 113 Tenn. 40 (81 S. W. 1249); *State Mut. L. Ins. Co. v. Long*, (Tex. Civ. App.) 178 S. W. 778; *Grand Fraternity v. Melton*, 102 Tex. 399 (117 S. W. 788); *Prudential Ins. Co. v. Dolan*, 46 Ind. App. 40 (91 N. E. 970); *Hodnett v. Aetna Life Ins. Co.*, (Ga. App.), 87 S. E. 813; *Wolff v. Mutual R. F. L. Assn.*, 51 La. Ann. 1260 (26 So. 89); *Hart v. Fraternal Alliance*, 108 Wis. 490 (84 N. W. 851).

In view of our holding on the question of suicide, it is unnecessary that we discuss other questions argued by appellant.

The judgment of the trial court is—*Affirmed.*

EVANS, C. J., STEVENS and ARTHUR, JJ., concur.