Edith S. Sweney, Appellee, v. Northwestern Mutual
Life Insurance Company, Appellant.

Gen. No. 8,228.

1

4

Heard in this court at the April term, 1928. Opinion filed July 2, 1928.

DOBBINS & DOBBINS, for appellant; NORMAN L. BAKER, of counsel.

HERRICK & HERRICK, BOYER & LEONARD and A. J. B. SHOWALTER, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

Appellee brought her action to recover on two insurance policies issued by the appellant upon the life of her husband, Merle A. Sweney, and in which the appellee is the named beneficiary. One policy is for $5,000, dated January 2, 1926, and the second policy is for the sum of $15,000, dated July 6, 1926. The general provisions of the policies, among other things, provide that all statements of the insured, in applying for the policies, shall, in the absence of fraud, be

deemed representations and not warranties; that if within one year from date the insured shall die * * * by his own hand, whether sane or insane, the liability of the company shall be limited to the amount of the reserve on the policy.

Merle A: Sweney died on Thanksgiving Day, November 25, 1926. Appellee duly notified appellant of the death and made and furnished to appellant satisfactory proofs of death. Action was brought to the September term, 1927, of the Champaign county circuit court. Summons was issued and the return of the sheriff recited service: "On the within named defendant (naming it), a corporation, by delivering a true copy thereof to J. Y. Hamlin, its district agent, the president of said corporation not being found in my county." The summons was served on July 11, 1927. Appellant filed a plea to the declaration (appearing personally and by counsel), in the nature of a plea in abatement, denying the jurisdiction of the court for the want of service of the summons upon appellant. And the plea after certain negative statements averred that the said J. Y. Hamlin is not an agent of this defendant corporation, and was not, at the time of the delivery of the copy of said summons to him, an agent of said defendant; that on the contrary the said J. Y. Hamlin was an employee of one James M. Cowan, and engaged solely for the purpose of soliciting applications for insurance to be issued by this defendant, and that he, the said J. Y. Hamlin, did not then and there have any power or authority to bind this company by any contract of any kind or character, and was then and there performing services solely for the said James M. Cowan, under a contract with the said James M. Cowan, in and by which he, the said J. Y. Hamlin, was permitted to solicit applications for the said insurance policies to be issued by this defendant company, and upon the same being accepted by this defendant com-

pany was paid a commission therefor by the said James M. Cowan, the said James M. Cowan being then and there an agent of the said company.

Appellee demurred to the plea and upon a hearing the demurrer was sustained, to which ruling appellant excepted. Thereupon appellant pleaded to the merits the general issue, with notice of certain defenses that would be made to the declaration upon the trial of the cause, namely:

First, that Merle A. Sweney, the insured, died of his own hand within one year from the issuance of each of said policies;

Second, that Merle A. Sweney, prior to the time of the application, had suffered from diseases of the nervous system and had also had and suffered from a disease of the brain;

Third, that said insured did knowingly and intentionally conceal from appellant that he had been suffering from overwork in his profession as an instructor or professor in the University of Illinois, and had been threatened with a nervous breakdown; that he had also been suffering from insomnia and nervousness; that he had consulted and advised with a physician in regard to the same, which constituted a fraud upon appellant; and

Fourth, that the said insured, at the time of making the application for insurance, "did then and there know that he had, prior thereto, suffered from diseases of the kidneys, bladder, anemia and other diseases of the blood, and from a disease of the gland known as pancreas, and that he had had symptoms of low blood pressure and of high specific gravity of the urine and had had prior thereto sugar in his urine as a result of his physical condition"; that said insured concealed the said conditions from the appellant and made false answers to questions set out in the application covering said subject matters, upon which appellant relied, and which resulted in a fraud upon appellant.

At the close of the testimony, upon the motion of appellee and over the objection of appellant, the court withdrew from the jury the consideration of all testimony submitted by appellant on the notices of defenses numbers two and three, to which appellant excepted and the cause was submitted to the jury based upon testimony offered to establish two defenses, namely, Did Merle A. Sweney die by his own hand within one year from the date of issuing each of the policies, while sane or insane? And, had the deceased, Merle A. Sweney, procured the policies in question by means of a fraudulent, material misrepresentation that he had never suffered from sugar in his urine? Upon the motion of appellee and over the objection of appellant, the court submitted to the jury a special interrogatory as follows: "Did Merle A. Sweney commit suicide," to which the jury answered, "No." There was a verdict and judgment in favor of appellee in the sum of $20,347.20 against appellant and the record is brought to this court, by appeal for review.

There are various assignments of error. It is first contended by appellant that it was error to sustain a demurrer to the plea of want of jurisdiction, and that appellant, by pleading over, has not waived the error. There are numerous answers to this contention. The provision for service upon the director of trade and commerce, Cahill's St. ch. 73, ¶ 338, does not repeal or exclude the provisions of the Practice Act, Cahill's St. ch. 110, for service on agents of insurance corporations. (*Supreme Hive Ladies of Maccabees of World v. Harrington,* 227 Ill. 511, 519.) The service of the summons in the case at bar was had under section 346 of chapter 73 of the Revised Statutes, Cahill's St. ch. 73, ¶ 346, relating to foreign insurance companies, and under the construction given to the act in *Hancock Mut. Life Ins. Co. v. Schlink,* 175 Ill. 284, 289, the service was in accordance with the statute. In any event, appellant

having appeared in person and by counsel and having filed pleas and engaged in a trial of the cause upon its merits, cannot now be heard to urge that the court did not have jurisdiction over its person. (*Supreme Hive Ladies of Maccabees of World v. Harrington, supra,* p. 525; *Pratt v. Harris,* 295 Ill. 504, 507.)

It is next urged in reversal of the judgment that the court erred in submitting to the jury, upon motion of appellee, the special interrogatory: "Did Merle A. Sweney commit suicide?" Appellant objected to the submission of the interrogatory in the following language:

"We object to the special interrogatory, as that will not be decisive of the case and it is not proper to submit special interrogatories which are not decisive of the case. It is one of the issues. It is decisive one way and not the other." No motion has been made to set aside the special verdict upon the special interrogatory, to which the jury answered, "No," and no claim is made that it is against the weight of the evidence.

Appellant, in its motion for a new trial, charged error in the submission of the special interrogatory, but no move was made to set the verdict aside, and it is assigned as error only on the ground that the court made the submission. It becomes important therefore to determine whether this was a proper and legal special interrogatory as applied to the facts in the case. Appellant concedes that it involved a material question and one of the ultimate facts to be determined in the case, but that it was not decisive of the whole case. It is conceded that the answer to the interrogatory in the affirmative would be inconsistent with a verdict for appellee, but it is objected that the answer "No" is not determinative of the other issues for either appellee or appellant. The answer "Yes" to the interrogatory would determine that appellee could not recover and that there must be a judgment for appel-

lant. Must a special interrogatory cover all the issues in the case or be determinative of the whole case? The special interrogatory must determine ultimate facts and not evidentiary facts. (*Pressley v. Bloomington & Normal Railway & Light Co.*, 271 Ill. 622, 632; *Wicks v. Cuneo-Henneberry Co.*, 319 Ill. 344, 250.) Section 79 of chapter 110, of the Practice Act, Cahill's St. ch. 110, ¶ 79, provides: "And in any case in which they render a general verdict, they may be required by the court, and must be so required on request of any party to the action, to find specially *upon any material question or questions of fact which* shall be stated to them in writing," etc., and, "When the special finding of fact is inconsistent with the general verdict, the former shall control the latter and the court may render judgment accordingly." So that under the statute it does not seem necessary that the special interrogatory should cover all of the ultimate issues of fact in the case, nor in all cases or in any case that it must be consistent or inconsistent with the general verdict or conclusive as to the rights of both parties. This construction of the statute was followed in *Barron v. Burke,* 82 Ill. App. 116, 124, where the court held:

"We do not understand the statute relating to special findings to require, nor any decision of this or the Supreme Court to hold, that an answer to a special interrogatory must be absolutely decisive of the whole case, but only that it relate to some material question of fact in the case, and that the fact must be an ultimate fact, that is, a fact conclusive on some issue in the case. In the case of two counts on two promissory notes, each count being upon a separate note, where the defense was payment as to one of the notes, and want of consideration as to the other, it would be entirely proper to submit to the jury a question as to whether the one note was paid and another question as to whether there was any consideration for the other note."

The subject is discussed exhaustively in *Chicago &
N. W. Ry. Co. v. Dunleavy,* 129 Ill. 132, where one of
the specific interrogatories submitted was: ''Was the
deceased exercising reasonable care for his own safety
at the time he was killed?'' This question answered in
the negative would be inconsistent with a verdict for
the plaintiff, but answered in the affirmative only es-
tablishes one of the ultimate facts necessary to estab-
lish plaintiff's case, and is no more determinative of
the case than the question in the case at bar.

In *Chicago & A. R. Co. v. Harrington,* 192 Ill. 934,
the court modified interrogatories and submitted the
following: First, Did the act of the plaintiff, John
Harrington, in placing himself on the footboard of the
engine next to the car, contribute to cause the injury
he received? And, second, Was the plaintiff, John
Harrington, using proper care for his own safety by
being upon the footboard of the engine between the car
and the engine when he was injured? It will be noticed
that these questions only covered one of the vital is-
sues in the case. The court held (page 34): ''But, in
case of a general verdict for the defendant, an affirma-
tive answer to the first interrogatory framed by the
court, and a negative answer to the second interroga-
tory framed by the court, would have been consistent
with such general verdict for the defendant, and not
inconsistent with it. If, in case of a general verdict
for the defendant, the first interrogatory had been
answered in the negative, and the second in the affirm-
ative, it may not have affected the general verdict in
favor of the defendant, because the evidence may have
shown that the defendant was not guilty of negligence;
and, if the defendant was not guilty of negligence, the
plaintiff was not entitled to recover, even if he was not
guilty of contributory negligence. The interrogatories,
submitted by the court were designed to secure a spe-
cial finding as to certain matters which might super-
sede the general verdict, if the verdict should be for

the plaintiff, and it was not improper to put the matter to the jury in that way. 'The facts, upon which a jury should be asked to find specially, should be material facts, which, if found, would be controlling.' (*Chicago and Northwestern Railway Co. v. Dunleavy, supra; Terre Haute and Indianapolis Railroad Co. v. Voelker,* 129 Ill. 540; *Pike v. City of Chicago,* 155 id. 656.) The theories of appellant, as embodied in the special interrogatories submitted by it, were presented in the instructions given by the court."

We find nothing in the statute or decisions of the court requiring special interrogatories to cover every material phase of the case, or to respond to every ultimate fact at issue. There was no error in submitting the special interrogatory in question and the answer thereto is final and conclusive that Merle A. Sweney did not commit suicide, as applied to the facts in this case. If appellant desired the special interrogatory to have wider scope or to cover other ultimate facts, it should have moved an amendment or submitted additional interrogatories.

It is next contended that the court erred in withdrawing from the jury at the close of appellant's proof all consideration of the proofs tendered under the second and third notices of defense and in not holding that the proofs showed, at the close of all the testimony as a matter of law, that the insured died from his own hand and in refusing to instruct that the jury find a verdict for the appellant. These two contentions involve all the proofs heard in the case and should be considered together. The proofs as submitted by appellee showed substantially the following state of facts as to Sweney's death:

Merle A. Sweney, at the time of his death, was 36 years old. He was a graduate of the University of Illinois, holding a bachelor's degree and also a master's degree from that institution. He was a man of culture and refinement. He was married in 1916 to the plain-

tiff. To this marriage three children were born, Eleanor, aged nine, and two boys, Arthur and Robert, aged, respectively, six and four years at the time of the father's death. The insured, at the time of his death, was living happily with his wife and children on a farm of 254 acres in Vermilion county, Illinois, which farm he was operating on his own account. The deceased, for a short time after his graduation, was an instructor in the college at Stillwater, Oklahoma, and from there he came to the University of Illinois, where he was an instructor for the last five years of his life, resigning from that institution in the summer of 1926. Shortly after his return to Illinois from Oklahoma, the deceased commenced the operation of a farm of 165 acres north of the city of Champaign. He went to Europe with his wife in 1920.

His home life was exemplary. He played with his children, taught them himself and was devoted to his wife and family. He was a member of the Presbyterian Church in Champaign and attended its men's club meetings, committee meetings and services. He was a man of clear mind, good memory, optimistic of disposition and even tempered, kind to his family. He loved his beautiful home and was planning to construct bird and flower preserves around it. He was a willing and congenial worker and co-operated with his colleagues in the university. He was upright in his dealings with his fellow men.

At the close of the university year, about the first of July, 1926, he severed his connection with the University of Illinois and about the same time purchased a farm of 254 acres in Vermilion county, south of Fithian, Illinois. He paid $20,000 in cash for this farm and assumed a mortgage of $20,000. This farm was improved with a new 8-room brick house, equipped with electric lights, hot air furnace and modern plumbing. Besides these improvements, there was also a tenant house, stucco garage, ample barns and outbuild-

ings, all in a good state of repair. Four thousand dollars of the purchase price for the farm was borrowed from the bank, with Mrs. Sylvia Sendenberg, his mother-in-law, as surety on the note; the balance was borrowed from his mother, brother and cousins. In addition to the $20,000 he had also borrowed $8,000 about July 31st from the bank with which to buy sheep. At the time of his death, besides his farming equipment, he had on hand about 2,500 head of sheep, part of which were ready for market. He also always had on hand a large stock of livestock in addition to the sheep. In addition to the operation of the farm on which he lived in Vermilion county, he was operating at the time of his death a farm of 330 acres just north of the city of Champaign. He personally supervised the management and running of both of these farm projects. There was no evidence that anyone was pressing him for the payment of any indebtedness. The plaintiff testified that she signed all of the deceased's notes with him and had independent property of her own, and that no one had ever made any demand whatever on her for payment.

As to his physical and mental condition, his teaching colleagues in the university, who observed him almost daily, a student in his classes, his friends and farm neighbors who worked with him and who saw him almost every week down to the time of his death, and the members of his family, including his mother and mother-in-law all testified that he was cheerful, happy, active and vigorous; that he did the same work on his farms that the hired men did, and, without exception, all of the witnesses testified that they observed no change in his mental or physical condition down to the time of his death. While his university colleagues did not see him after July of 1926, the members of his family and his farm neighbors did see him, and testified. The applications for his insurance in January and July of 1926 showed his weight to be 144

pounds in January, 132 pounds in July, and, at the time of his death his weight was about 145. He passed two exhaustive examinations for insurance in January and July, in which scientific tests were made to determine whether he had sugar in his urine, as well as the condition of his blood pressure and pulse, and he was found an acceptable, insurable risk.

Dr. Honn was the personal and family physician of deceased for the last eight years of the life of insured. Dr. Honn testified that he had no personal recollection whatever of any illness of Sweney other than a cold, for which Sweney consulted him in October of 1926, which was simply a trivial, acute condition.

The hired man on the Fithian farm testified that while during the months of October and November, 1926, Mr. Sweney had been suffering from stomach trouble and a cold, yet that on Thanksgiving morning he reported to his employee that he felt better than usual. The wife of the same farm employee testified that the first she noticed any illness at all on the part of Mr. Sweney was the slight cold he had in October, and one occasion, about two weeks before his death, when he did not work that day, and that other than those two occasions he was in excellent health during all the time that he lived on the farm. This is the substance of all of the evidence of any physical ailments within the last two years of his life.

On the Monday or Tuesday before his death Mrs. Sendenberg, his mother-in-law, told him she had some money that he could use if he needed it, and he told her he didn't need it. At the same time she asked him if he would bring his family and eat Thanksgiving dinner with her in Champaign, and he told her he would if the roads were so that they could get there. On Thanksgiving morning he arose between 5:30 and 6 o'clock and had breakfast in the kitchen. Shortly afterwards he went out and helped with the feeding of the sheep, as usual. He threw down the hay to feed the

sheep and helped unload it. He then went back to the corn crib and loaded a wagon with ear corn and went to the field and scattered the corn to the sheep. He then got off the wagon and said to Cunningham, his tenant, that he and the family were going to Champaign to eat Thanksgiving dinner and probably would not be back until the next day. Immediately after this he went into the house—about 10:15. He entered the house through the kitchen, which is just west of the dining room, where his 9-year-old daughter, Eleanor, was getting her two little brothers ready to go to Champaign, and he asked her whether she and the boys were about ready. He then went upstairs in the house, started to wash his hands, and went down to the basement to fire the furnace before leaving for Champaign. It was about 10 minutes from the time he entered the house until there was a noise of an explosion in the basement. He was in the basement about five minutes. Just before the explosion his wife and his children called down to him, and his daughter Eleanor testified that she heard a light voice answer.

His wife ran to the basement and then called Cunningham, the tenant. Sweney was found lying on the floor close by a workbench, with a double-barreled shotgun lying underneath his body. There was only one shell in this gun. The evidence showed that in the latter part of October, about a month before, Sweney had borrowed this shell from his tenant, Cunningham, and had placed it in the gun to try to kill some dogs that were worrying the sheep. There was no evidence that he had fired the gun or taken the shell out after this time. The gun had been kept in a corner of the basement, near the furnace, and was about 8 or 10 feet from the workbench. No one had seen the gun during the preceding two or three weeks. This gun itself is a very dangerous weapon, as appears from its inspection by this court. It has been certified with the record. It is an old-fashioned Belgian shotgun. The left ham-

mer will not stay cocked at all, and the hammer on the right barrel (which was the one which was discharged, causing Sweney's death) can be pushed off with a light touch of the thumb. If this gun were dragged across a bench or table with the hammer side down, the hammer on the right side pulls back easily and discharges easily.

From the fact that the feet of Sweney were about 18 inches or 2 feet south of the west end of the workbench, and from the fact that there was a pool of brains at the feet and that the shot marks were on the south brick chimney wall, south and east of the west end of the workbench, and that blood and brains were on the west side of the rafters south and east of the west end of the workbench, but no traces on the east side of the rafters, it is practically an undisputed fact that Sweney must have been standing facing north or northwesterly toward the north wall, close to the west end of the workbench, when the gun was discharged. He had blunt-toed shoes on both of his feet when found. There was no stick or similar object near him which could have been used to touch off the trigger in the room where the accident happened. While there were some boxes containing some bolts and repairs on top of the workbench, these boxes were at the center and from the center on up to the east end of the workbench and not on the west half of the top of the workbench.

The first of the neighbors to arrive, Joe Glover, found that there was fresh coal in the furnace.

The shot went clear through the head and there were no shot found within the skull.

In addition to this statement of the facts, it was brought out that after the explosion the body of deceased was found lying on the floor of the basement with the shotgun underneath the body. The basement runs east and west and is one large room about 25 feet long and 12 to 15 feet in width. There was a workbench on the north side of the basement from 8 to 10

feet in length against the north wall and extending nearly to the west end of the basement. There was a vise, buckets, tools and other things upon the bench, the vise at the west end and the other articles near the center eastwardly and scattered upon the bench. There was a furnace on the south side of the basement and a little east of the bench and about one foot from the south wall. When Sweney was found, the body was twisted as if he had turned over on the right side, face downward, from his hips up and facing more towards the east. There was an old rug under the body. It was 5 or 6 feet by 8 feet. The body was about 5 feet 9 inches in length. The vise was about 3½ feet from the floor.

Cunningham, the tenant, who first went into the basement, states that Sweney's body was found lying southeast and northwest, the feet about 18 inches southwest from the vise on the bench and the body and head to the southeast. The gun was found under the body, the butt or wooden end near the west end of the workbench, about a foot or two east from the bottom of the vise, and the muzzle was toward the southeast and projected beyond the body at just about the belt line on the right side. The butt of the gun was towards the leg of the workbench and just the hammer showed, projected between the knee and the thigh of the left leg. Sweney's head was towards the furnace and about two feet away from it. Where the head lay there was a pool of blood. On the wall of the brick chimney, southeast from the end of the workbench, there were heavy splotches of brains and blood. The joists of the basement were about two feet apart. There were blood and brains on the west side of these joists, which ran north and south. The chimney goes up to the floor and the joists come right up to the chimney. The most of the blood and brains extended about 2½ feet north from the chimney on the joists southeast of the west end of the workbench.

As to the exact wound caused by the shot, the proof shows that there was a wound between the eyes, between 2 and 3 inches in size. The head was badly mutilated at that spot, the skull was crushed and fractured; and at the back of the head there was a wound. The upper part of the nose was taken away and the two eyeballs were inside the skull, and the fracture of the skull extended from the side of the eye to the ear. The upper part of the forehead above the eyes was intact, not blown away. At the back of the head the wound was about an inch higher than in front. The top of the head was cracked and the entire skull was all blown loose, an inch or two of it was blown or torn away in the back. It was not a clean shot through. There were fractures extending away from the wound. There were no powder burns found upon the face. No shot were found in the skull. The brain was intact except a part which was missing.

The proofs showed that the muzzle or barrel of the gun was longer than deceased's arm and that the gun had been kept near the chimney on the south side of the basement.

Altogether it is shown that deceased had $58,000 of life insurance, including the policies in question. It is insisted by appellant, and there is proof tending to show that while Sweney had been acting as an instructor at the university he had been conducting two farms of about 300 acres of land, and, in addition, taking a post graduate course at the university in an endeavor to obtain a doctor's degree, in the course of which he was required to write a thesis on the novels of Sir Walter Scott, which required a great deal of reading in addition to Scott's thirty novels. It is charged that he had suffered from overwork and was in a "run down" condition. To substantiate this, Dr. Honn testified that deceased called on him May, 1924, and that he was not feeling well, "seemed overworked and a little bit run down, not a serious condition at all.

\* \* \* I examined his blood pressure and found it practically normal for a man of his age.''

Appellant produced a note the deceased had given at the First National Bank at Champaign for $8,000, with his wife and mother-in-law as sureties, and it was shown that this note was to become due November 30, 1926. This note evidently covered the purchase of sheep. But it was also shown that a few days before his mother-in-law had stated that she had some funds on hand which he was welcome to use and his credit at the bank apparently was good, with the signatures of his wife and mother-in-law.

A witness, Grover Ard, who had worked for him in 1924, testified that in a conversation about the profits deceased could have made if he had purchased some Champaign city real estate, deceased remarked, ''he hated—he would rather die than for anyone to go on his note,'' and he may have meant this statement in a matter where it was pure speculation. He evidently did not hesitate or become worried thereafter when his wife and mother-in-law signed his notes in legitimate business. Ard further testified that in the work upon the farm when things did not go right, deceased would get a little nervous, which is a common circumstance among tillers of the soil.

The strongest testimony given by any witness tending to show mental aberration and physical weakness was given by the witness Clarence Cunningham, the tenant or laborer upon the farm. Cunningham testified on cross-examination: ''He told me the morning of his death that he felt like a man who had been out all night. He had told me frequently he was sick at his stomach, didn't say too sick to work, he was just sick. He was nervous at times during the fall and at times got excited easily. He didn't seem to get angry, he just seemed like he wanted to work faster and talked fast and excited, he would talk flighty-like and talked fast, excited like, is the only way I can explain it. *I noticed*

*him do that three or four times during the fall.* I last noticed that condition about a week and a half before his death. He said it made him nervous to ride through the mud holes in a truck and that he felt like jumping out. We were driving along the public highway north of the house hauling baled hay from a carload, when he said that. We were driving right along by these mud holes in the public highway. On that Thanksgiving Day the highway was in bad condition.''

Outside of the testimony as recited, the record is bare to show that the health of deceased was impaired or that he had any mental aberration from which he could suffer an insane impulse and take his life. The witness Cunningham testified that ''He would talk flighty,'' but nowhere gives any of his language indicating flightiness, and Cunningham evidently at no time doubted the deceased's mentality because a month before the accident he loaned the deceased a shell to put in the gun. There is no proof in the record tending to show insanity or mental aberration, or an insane impulse on the part of the deceased to account for the taking of his life by his own hand, unless such conclusion is to be arrived at from pure imagination and speculation. And there is no proof in the record tending to establish that the deceased from childhood or anytime had suffered or been afflicted with any disease of the brain or nervous system, and the court, on the failure of proof, did not err in withdrawing the proofs from the consideration of the jury under appellant's second notice of defenses.

But appellant assigns error in that the court did not instruct a verdict for appellant on the ground that the proofs, as a matter of law, showed that Sweney committed suicide and appellant cites numerous cases as authority in this case that the facts and circumstances in the case at bar establish a suicide, *per se,* as a matter of law. In *Chicago Guaranty Fund Life Soc. v. Wilson,*

55 Ill. App. 138, 140, the deceased was found in bed dead from narcotic poisoning, with a vial close at hand. The testimony showed that he had been using drugs to relieve irritation of gums caused by a new set of teeth. He was apparently guilty of embezzling his employer's money and left a note bidding good-by to his family. The jury found a verdict for the plaintiff, but this court properly reversed that judgment and held that it was a case of suicide as a matter of law.

In *Inghram v. National Union,* 103 Iowa 395, 72 N. W. 559, there was testimony showing that the deceased was a defaulter. He went into the vault of the court-house on Sunday morning. His deputy heard two shots and went into the vault and found him on the floor groaning with two pistol shot wounds in the head. The testimony showed that the pistol had been discharged twice; that the first wound was not mortal, but that the second wound was mortal. Under these circumstances, the court held, as a matter of law, that suicide was the only explanation. It was considered that no one would accidentally shoot himself twice in the head.

In *Ætna Life Ins. Co. v. Alsobrook,* 175 Ark. 523, 299 S. W. 743, the insured was arrested at 6:30 in the morning by a United States Marshal on a warrant charging the defendant with embezzlement of mail. He asked the marshal for permission to drive his own car to Pine Bluff to give himself up. He immediately went to a friend and borrowed a double-barreled shotgun, stating that he wanted to go hunting, and was cautioned by the friend that the gun was loaded. This gun was put in the read end of his car, and at 7:30 the same morning he was found on a byroad near the car. There were no other tracks near the car, and the evidence clearly showed that he had placed the shotgun in his mouth and discharged it. The territory where he was found was not suitable for hunting, and under these facts the court rightly held that the undisputed evi-

dence could only point to suicide. What was said about powder burns in that case was directed toward the point that the shotgun must have been placed in the insured's mouth.

In *Rens v. Northwestern Mut. Relief Ass'n,* 100 Wis. 266, 75 N. W. 991, the insured frequently became intoxicated and was so on the day prior to his death and the night before he attempted to cut his throat, and on the same evening he said to his mother, "Good-by for the last time," and on the following day, the day of his death, he tried to borrow a rifle, but failed, and in the afternoon attempted to borrow a revolver for the purpose of shooting rats. Later he bought a self-cocking revolver with ammunition and said that he "had a weapon and would never see another sunrise." His father was sent for and several other neighbors came. The deceased had the revolver in one hand, flourishing it in the air and swinging his arms. He resisted an attempt to take the revolver away from him. He went into the dining room alone and shortly afterwards a shot was heard, and the deceased was found in a room, lying on the floor, with the revolver close to him. Further comment on this case is unnecessary.

In *Beverly v. Supreme Tent of Maccabees of World,* 115 Iowa 524, 88 N. W. 1054, there was a verdict for the defendant in the court below, and this verdict was affirmed. The insured was engaged in a losing business, "was evidently considerably discouraged, and there is evidence which tends in some degree to show that he had attempted suicide on a former occasion. The witness who last saw him as he went into the basement where the shooting occurred a moment later, speaks of his countenance as being pale and haggard, and his conduct generally as indicating distress of mind." He went into the basement alone, and within a very short time, two or three minutes, the pistol shot was heard, preceded by no outcry.

In *Gavin v. Des Moines Life Ins. Co.,* 149 Iowa 152, 126 N. W. 906, the insured was sick in bed and had been too ill to work for 10 days. While the plaintiff, his mother, went out to get a doctor, he evidently got out of bed, procured a loaded revolver from his dresser and was found with a revolver shot exactly through his heart. There were powder burns in this case, and the mother herself at the time expressed her belief that her son had committed suicide.

In *Johns v. Northwestern Mut. Relief Ass'n,* 90 Wis. 332, 63 N. W. 276, the insured, a tailor, was living with his second wife and had children by a former wife. A son, 13 or 14 years of age, had left home a few months before. The deceased felt bad about it and was melancholy during the few months before his death. The insured was found in a cistern, the only entrance to which was 15 by 20 inches, and under the peculiar physical situation the court found it impossible for him to have gone into this cistern unless he went intentionally. If he accidentally stepped into the hole either one foot or both of his arms would absolutely have prevented the body from going through.

In *Felix v. Fidelity Mut. Life Ins. Co.,* 216 Pa. 95, 64 Atl. 903, the proofs of death furnished by the plaintiff herself stated that death was caused by suicide and the jury in the court below found that she was not entitled to recover. The deceased was found sitting in his office chair with the top of his head blown off, his arms down, shotgun resting between his legs, with a loop of twine through the trigger guard and the other end around his right foot.

In *Grand Fraternity v. Melton,* 102 Tex. 399, 117 S. W. 788, the insured was found by two witnesses lying on a couch with a wound in his left breast and a pistol on the floor within a few feet of the couch. He was not dead. The insured told both witnesses that he had shot himself and that he was up against it and owed

on his home, and that he asked for the pistol and said he wanted to blow his brains out.

These and kindred cases do set out a state of facts where all reasonable minds must conclude that the insured came to his death by self-destruction, but the rule is that where the cause of death of the the insured is unexplained, and the circumstances are such that it might have resulted from accident, homicide, negligence, natural causes or suicide, the presumption is in favor of death by one of such other causes and against death by suicide. Therefore, the burden of proving death by suicide as a defense is on the defendant, notwithstanding the verdict of the coroner's jury was suicide. (37 C. J. 619, § 815.)

Proof of suicide must be clear and convincing and of sufficient weight to overcome the presumption against suicide. (37 C. J. 640; 6 Cooley's Brief on Insurance [2nd Ed.], p. 5475, and many cases cited.)

Where circumstantial evidence is relied on the proof must be such as to exclude any reasonable hypothesis that the insured met his death by natural or accidental causes or any other causes than that of suicide (37 C. J. 640).

Proof of a motive for suicide merely weakens the presumption against the act and is not in itself sufficient to establish suicide. (37 C. J. 641, note 67 [a].) And our own courts have held that where circumstantial evidence is relied upon to show suicide, the proof must be so clear, strong and convincing as to exclude any reasonable hypothesis that the insured met his death by natural causes or accidental means or any other cause than suicide. The presumption of law is against suicide. There is a presumption of law against death by suicide (or self-destruction) where the circumstances are such that death might have resulted from negligence, accident or suicide. (*Ideal Elec. Co. v. Penn Mut. Life Ins. Co.*, 189 Ill. App. 331, 335;

*Knights Templars' & Masons' Life Indemnity Co. v. Crayton,* 209 Ill. 550, 557; *Supreme Tent Knights of Maccabees of World v. Stensland,* 206 Ill. 124, 132; *Supreme Court of Honor v. Barker,* 96 Ill. App. 490, 496.)

In the last case the court held:

"A legal presumption also arises in favor of plaintiff's contention that the death was an accident. No one is presumed to knowingly incur physical pain and death. (*C. & E. I. R. R. Co. v. Hines,* 132 Ill. 161.) *Fidelity & Casualty Co. v. Weise,* 182 Ill. 496, was a suit on an accident certificate or policy, where death was caused by a bullet. Under the terms of the certificate the burden was on plaintiff to prove death by external, violent and accidental means, and in that respect it differs from the case before us; but the court there said:

" 'The presumption of the law is that all men are sane and possessed of the love of life; are animated by the instincts of self-preservation and the natural desire to avoid personal injuries and death. . . . The plaintiff was entitled to the benefit of the presumption the assured did not take his own life. The presumption was not conclusive but rebuttable.'

"In *Traveler's Ins. Co. v. McConkey,* 127 U. S. 661, where death ensued from a pistol shot, it was held, 'So strong is the instinctive love of life in the human breast, and so uniform the efforts of men to preserve their existence, that suicide can not be presumed.' That court quoted with approval from *Mallory v. Travelers' Ins. Co.,* 47 N. Y. 52, a suit upon an accident policy, where death was caused either by accident or by the suicidal act of the deceased, as follows:

" 'But the presumption is against the latter. It is contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person.'

"In *Mutual Life Ins. Co. v. Wiswell,* 56 Kan. 765,

35 L. R. A. 258, the court said: 'It seems to be fairly settled that, in the absence of satisfactory evidence as to the death being accidental or suicidal, the presumption is in favor of the theory of accidental death.' (*Standard Life and Accident Ins. Co. v. Thornton,* 49 L. R. A. 116; *Star Accident Co. v. Sibley,* 57 Ill. App. 315.) 1 May on Insurance, section 325, states the rule thus: 'When the dead body of the insured is found under such circumstances, and with such injuries, that the death may have resulted from negligence, accident, or suicide, the presumption is against suicide, as contrary to the general conduct of mankind, a gross moral turpitude not to be presumed in a sane person; and whether it was from one or the other, if there is any evidence upon the point, is for the jury.' The case, then, clearly is such that we would not be warranted in disturbing the verdict for plaintiff on the facts.''

Much light is thrown upon this subject in the copious note appended to *Dill v. Sovereign Camp, Woodmen of the World,* reported in 37 American Law Reports, pages 171 to 180, and the principles cited fully sustained.

In the case at bar appellant is far from presenting such a state of facts, upon which all men of reasonable minds would agree that the insured took his own life. The insured was wearing a pair of square-toed shoes with which, it has been argued in another case, he could not have operated the trigger of a gun; his arms were too short to reach it and no string, stick or instrument was found by which he could effect a discharge of the shot. He had used the gun in connection with his sheep and this is the only use he is shown to have made of it. The gun was kept behind the furnace, between the furnace and the chimney. He may have laid the gun out upon the workbench with the intention of taking it to his Champaign county farm, where he also had sheep, or with the intention of replacing it behind the furnace, and in either event, if he had taken

up the gun by the muzzle, the accident might have happened. Nothing in the history of the insured—his domestic, financial, physical or educational life— shows the implanting of any seed that should grow and ripen into self-destruction. He was young, active, energetic, educated and brilliant, with a fruitful future before him, and the record presented strongly negatives the theory of suicide. The court did not err in refusing to instruct a verdict for appellant.

The question of suicide having been submitted to the jury by a special interrogatory, the jury's finding is conclusive upon the court, where no objection is made to that verdict, and it is not included in a motion for new trial or assigned as error. (*Brimie v. Belden Mfg. Co.*, 287 Ill. 11; *Schleicher v. General Accident, Fire & Life Assur. Corp.*, 240 Ill. App. 247.)

Appellant assigns error upon the court's ruling in refusing to permit Dr. Honn to read from a card memoranda which he testified he had made when the insured visited him in 1924. Dr. Honn testified that the insured visited him in 1924 and made certain statements to him as to his physical condition, all of which the doctor had recorded upon a memorandum card. The doctor testified: "As I have it here, he had not been feeling well. He told me several months before that he has had some sugar in the urine and on the strength of that I went over him," etc.

On cross-examination of Honn he could remember nothing of the conversation or the detail of it, even after refreshing his memory from the card, and the court thereupon refused to permit the doctor to read from the card. Appellant did not offer the card in evidence, although the doctor's testimony had made it competent. Dr. Honn did testify, however, that at that time he made a complete examination of the insured and found no sugar and that his blood pressure was normal. This substantially covers the testimony offered by appellant to set aside the contract of insur-

ance for fraud and misrepresentations, and it is entirely deficient.

Appellant complains of the giving of appellee's first instruction, which informed the jury that in actions upon policies of life insurance the introduction in evidence of the policies, together with proof of the payment of the premiums required to be paid and proof of death of the party insured, and notice and proofs of death thereof to the company, as required by the terms of the policies, is sufficient under the law to make out a prima facie case in favor of the plaintiff, "and the burden of proof is then cast on the defendant, if it wishes to avail itself of matters of defense, to show such policy was invalid; to introduce evidence thereof and to prove the existence of such defense by a preponderance or greater weight of the evidence in the case."

The only case cited by appellant in support of the criticism on this instruction is *Stansfield v. Wood*, 231 Ill. App. 586, 590, where the term "prima facie" was used in reciting the Motor Vehicle Law, Cahill's St. ch. 95a, and the court, citing *Johnson v. Pendergast*, 308 Ill. 255, held the instruction was erroneous, stating that "it is a matter of common knowledge that there is probably no law upon our statute book as to which there is such widespread popular misunderstanding and misconstruction of its terms. There is no speed limit in miles fixed by this section of the statute. This misconstruction is not confined to the ordinary citizen but is shared by many officials as well." The court, however, did not hold that the giving of this instruction was reversible error, but said:

"It is not every error, however, which will justify a reversal. To justify a reversal on account of error, it must appear from the record that upon another trial, if the same error does not intervene, a different result might be expected so that the error would deprive the

defendant of some substantial legal right. Where it can be said from the record that the error assigned could not reasonably affect the result of the trial, the judgment of the trial court should be affirmed. . (*People v. Heard,* 305 Ill. 319; *People v. Weir,* 295 Ill. 268.)''

Appellant further criticises the use of the word ''invalid'' in the first instruction and argues that no jury would ever find for a defendant insurance company when it was contending that its policies were invalid. We think the criticism expresses an exaggerated fear. If the insured committed suicide, or the terms of the contract had been broken, the policies would be invalid in the hands of appellee the same as a note which had been paid or any other contract which had been rendered void, and we do not believe that the jury were prejudiced by the giving of the instruction.

Appellant assigns error upon the giving of appellee's fourth instruction, informing the jury that where a man suffers injuries resulting in his death, which injuries might have been intentionally inflicted upon himself, and there is no preponderating evidence as to the cause of such injuries, then the presumption of law is that death was caused by accidental means and not intentionally self-inflicted or suicidal. Appellant cites *Guardian Mut. Life Ins. Co. of New York v. Hogan,* 80 Ill. 35, 41; *People v. Cochran,* 313 Ill. 508, 524, and *People v. Saylor,* 319 Ill. 205, 212, as holding that the instruction last cited is reversible error. In *Guardian Mut. Life Ins. Co. of New York v. Hogan, supra,* the decision went off on the finding that the form of the instruction required the defendant to prove suicide by more than a reasonable doubt, and in *People v. Cochran, supra,* and *People v. Saylor, supra,* each were criminal cases and proofs were offered by the defendants in each case to show that the defendant was insane at the time the act was committed, and the court held: ''The law does not presume every person accused of

crime to be sane until the contrary is shown. The only effect of the presumption of sanity is to require the introduction of evidence tending to prove insanity. When that is done the presumption no longer prevails.'' But the instruction given is quite another matter. The instruction refers to a case ''where there is no preponderating evidence'' or, as frequently is said, ''The evidence is evenly balanced,'' and in such a case, under the authority of *Wilkinson v. Ætna Life Ins. Co.*, 240 Ill. 205, 211, and *Fidelity & Casualty Co. of New York v. Weise*, 182 Ill. 496, 499, appellee was entitled to the instruction as given.

Appellant complains of the court's ruling in permitting appellee to testify that deceased was a Presbyterian and a man of religious habits and took part in the religious and social functions of the church, citing *Gibson v. American Mut. Life Ins. Co.*, 37 N. Y. 580, in which case it was held error to have permitted the insurance company to prove that the insured was an atheist, for the purpose of proving that he would, as an atheist (in those days), be more likely to commit suicide. At the time the *Gibson* case was tried it was an age of great religious intolerance, and the fact that a suitor was an atheist might have prejudiced his cause before a jury. In the case at bar we cannot see that the fact that a man was a Presbyterian or believer in any particular church doctrine or government would impel him to or restrain him from self-destruction or suicide, in the proper or sufficient exigency in any different manner than any other well-minded citizen might be impelled or restrained. The testimony, however, may be sustained as tending to show the activities and bent of his mind, socially, religiously and mentally, the same as the testimony as to the insured's teaching and studying and daily life, which was gone into fully by both sides in the case. It is possible that society and the courts and juries have less abject fear of re-

ligion and the churches than they had 100 years ago. We do not believe that appellant was prejudiced by the proof.

Some other errors are pointed out and argued, but none of such a substantial or prejudicial nature as would warrant a reversal of the judgment in this cause. There are some errors in the record, but none, in the judgment of this court, that prejudiced the cause of the appellant or affected the verdict.

Under the substantial proofs, as we view them, there is no showing of fraud and misrepresentation on the part of the insured in effecting the insurance, and as to the exact cause of the death of Merle A. Sweney the proofs do not indicate. No one saw the occurrence, there is no line or measure that will indicate or speak the truth, it may appear to some to be suicide and self-destruction, to others the reasoning is equally cogent that it was an accident—a misadventure. But, however we view it, no one can come to a conclusion without the use of imagination and speculation, and in such cases the law steps in and declares it to be an accidental death. We cannot see that any different result would be obtained upon another trial and we therefore pass over some of the minor errors that creep into every record of this importance.

The Supreme Court said in *People v. Storer,* 329 Ill. 536, 542:

"The object of the review of judgments of trial courts by courts of appellate jurisdiction is not to determine whether the record is free from error but to ascertain whether a just conclusion has been reached, founded upon competent and sufficient evidence, in a trial in which no error has occurred which might be prejudicial to the defendant's rights."

In accordance with this principle, in the case at bar the judgment of the circuit court of Champaign county is affirmed.

*Affirmed.*