John Knapczyk, Appellee, v. Metropolitan Life Insurance Company, Appellant.

Gen. No. 42,865.

612

Heard in the first division of this court for the first district at the October term, 1943. Opinion filed February 28, 1944.

Hoyne, O'Connor, Rubinkam & Melaniphy, of Chicago, for appellant; Nathaniel Rubinkam, John C. Melaniphy and Melvin L. Gibbard, all of Chicago, of counsel.

Harry S. Posner, of Chicago, for appellee.

Mr. Justice Niemeyer delivered the opinion of the court.

Defendant appeals from a judgment of $1,112.50 entered against it on an insurance policy upon the life of Anthony Knapczyk, who died of a gunshot wound on December 5, 1940, within two years of the date of the issue of the policy. The sole defense is that the insured came to his death by suicide.

The policy contained the following provision: "Suicide:—If the Insured, within two years from the date of issue hereof, die by his own hand or act, whether sane or insane, the liability of the Company hereunder shall be limited to an amount equal to the premiums which have been received, without interest."

The insured was about 22 years of age at the time of his death; for at least three years he had been living

in the home of Ed. Huber, a juvenile police officer, who suffered from diabetes and heart disease but who worked daily when his health permitted; the insured drove Huber's car and did whatever errands were to be done; Huber bought his clothes and gave him money when he needed it. Huber's housekeeper testified that on the morning of his death the insured got up about 6:30 in the morning, it being part of his duties to get Huber's car at a public garage. The night man at the garage testified that the insured left the garage with the car. In the rear of the two-flat building in which Huber and the insured lived was a private 4-car garage, with four large doors opening into the alley; there was a small service door in one of these larger doors and another service door opening into the yard; about 9 o'clock a tenant of the first floor flat in the Huber building was in the alley with his dog; Mr. Butz, deceased at the time of the trial, who kept his car in the garage, entered by the alley service door, but immediately called Madden, who on entering the garage saw the insured lying on the floor behind the service door affording entrance from the yard; there were four or five layers of fresh newspapers spread out underneath the body, extending from the head to the ankles; the head was higher and slumped over to the left side; he was apparently propped up against the wall or some stuff that was in the garage, and fell over to one side; the insured was fully dressed, had on a suede jacket and sweater; there was a grey fedora hat underneath the back of his head; an automatic revolver was found under his left arm pit, about an inch or so from the left hand and parallel to the left hip; the police were called and Madden stayed behind the officer who examined the body; Madden did not observe a hole in the jacket or any blood or bruises about the face of the insured. The first police officer to arrive at the garage testified that alongside the left elbow, on the garage floor, he found an ejected "32" shell and two unfired

loaded shells in the chamber of the revolver; after a doctor had pronounced him dead and permission was obtained from the coroner's office, the police lifted the body and found that the bullet entered right below the heart and left the body right near the spine; there were powder burns on the leather jacket and marks indicating holes in the clothing, and the jacket, which was closed; the officer did not observe anything that indicated bruises about the face, the newspapers were lying flat and appeared to be freshly laid papers, everything was in shape in the garage and there was nothing about the clothing that indicated it had been messed up, outside the gunshot wound; the insured had on him $6 and some keys; the officer looked for the pellet, shaking the newspapers, but not making a thorough search through the whole garage. He did not find it. There is no evidence that it passed through the clothes at the back. The housekeeper testified that the day following the death of the insured she found in his dresser drawer a card on which was printed, "Forgive me. Tony K"; that insured always signed his name "Tony K"; she gave the card to Huber. The police officer in charge of the investigation testified that he saw this note at the detective's office at the 32nd district station in the regular file, but that it was missing at the time of the trial; that Huber brought it to the station. Huber died before the trial. Two young women who knew the family of the insured, and one of whom had gone out with him on occasions, testified that at the undertaking establishment they observed a bluish mark on the hand and on the face near the left ear of the insured; they designated these marks as bruises, but each stated that the undertaker had said that the marks were from the embalming. Several members of the family testified to having seen the marks. The undertaker, called as a witness by the defendant, testified there was nothing unusual about the body, except the gunshot wound, and he had no

recollection of any other bruises or wounds. Neither party examined him as to the marks which, according to plaintiff's witnesses, he had attributed to the embalming. There is no evidence of any motive for suicide except the statement of the housekeeper that the insured had been called for registration for the draft and thereafter appeared sullen and morose, stating on one occasion that "They will never get me to go unless they drag me there." Several witnesses, including members of the insured's family, testified that he was unaffected by the draft and talked of voluntarily joining the Navy after Christmas. Upon this testimony the jury found for the plaintiff.

Defendant contends that the court should have directed a verdict. The burden of proof rested upon the defendant to show suicide. In support of its position that a verdict should have been directed defendant cites a number of cases, including *Bernick v. Illinois Commercial Men's Ass'n*, 175 Ill. App. 511; *Mason v. Supreme Court of Honor*, 109 Ill. App. 10; *Von Crome v. Travelers' Ins. Co.*, 11 F. (2d) 350; *Ætna Life Ins. Co. v. Tooley*, 16 F. (2d) 243, and *Burkett v. New York Life Ins. Co.*, 56 F. (2d) 105. Plaintiff cites, in support of the judgment, *Anderson v. Inter-State Business Men's Accident Ass'n*, 354 Ill. 538; *Sweney v. Northwestern Mut. Life Ins. Co.*, 251 Ill. App. 1; *Downing v. Metropolitan Life Ins. Co.*, 314 Ill. App. 222, and *Smith v. Metropolitan Life Ins. Co.*, 317 Ill. App. 624.

Each of the cases cited was decided upon the particular facts disclosed by the evidence, and none may be said to be controlling in the present case. A general rule to be deduced from the decisions is that a verdict should not be directed for a defendant unless the only reasonable conclusion from the undisputed evidence is that the death resulted from suicide and not from accident or force or violence administered by a third person. As said in *Sweney v. Northwestern*

*Mut. Life Ins. Co.*, cited by plaintiff, "The presumption of law is against suicide. There is a presumption of law against death by suicide (or self destruction) where the circumstances are such that death might have resulted from negligence, accident or suicide." In the same case it was also held that "Proof of a motive for suicide merely weakens the presumption against the act and is not in itself sufficient to establish suicide." On the other hand, absence of an apparent motive to take one's life does not preclude a finding of suicide. In *Ætna Life Ins. Co. v. Tooley*, cited by defendant, the court said, ". . . it is not to be denied that successful business men, living in pleasant surroundings, do commit suicide." In *Burkett v. New York Life Ins. Co.*, also cited by defendant, the court directed a verdict for defendant and said, "The fact that the insured's situation and surroundings were such as to make it seem to others unlikely that his worries about his physical condition would make him wish to take his own life was not inconsistent with the existence of the suicidal intent."

Here the evidence of a motive for self-destruction is conflicting, and in our examination of the record for the purpose of determining whether or not a verdict for defendant should have been directed we will assume that there is no evidence of suicidal intent. The insured was not seen alive from the time he left the garage with Huber's car; several hours later his body was found in the garage in the rear of the building in which he lived, lying upon newspapers appearing to have been freshly laid upon the concrete floor; all the doors of the garage were closed and the windows had been nailed down so they could not be opened; there was no evidence of any struggle or violence; the bullet which caused the death was fired from a revolver held so close to the body as to cause a powder burn on the leather jacket; an expelled cartridge was lying near the revolver; the money in his clothes was not disturbed; his hat was partly on or under his head; no

reason was shown why the insured should be in the garage—Huber's car was not kept there; the position of the body, the undisturbed newspapers and clothes preclude the possibility of an accidental shooting. The only other hypothesis inconsistent with suicide is that he may have been shot elsewhere and his body carried to the garage; this would have to be done after the insured had left the public garage with Huber's car and at a time when people would be up and around and the chances of detection great; if he was shot elsewhere and the body carried to the garage, robbery could not have been the motive; the presence of the money when the body was found would be a further bar to consideration of any theory of robbery. There is no evidence of any motive on the part of anyone to wilfully harm much less to kill, the insured, hence the theory of murder is wholly speculative. The card which the housekeeper found and which Huber turned over to the police is some evidence corroborating the theory of suicide. Upon a careful consideration of all of the evidence, we are of the opinion that the only reasonable conclusion to be drawn from the facts before us is that the insured died from a wound self-inflicted and that a verdict for the defendant should have been directed.

Under the terms of the policy the liability of the defendant, in event of the death of the insured by suicide within two years from the issue of the policy, is limited to premiums paid on the policy, without interest. By its answer defendant admits its liability for $56.72, premiums paid, alleges that it has tendered this sum, which plaintiff refused to accept, and again tenders that amount.

The judgment of the circuit court is reversed and judgment is entered here for the plaintiff against the defendant for $56.72, without costs. The costs on the appeal are taxed against plaintiff.

*Reversed and judgment here for plaintiff.*

O'CONNOR, P. J., and MATCHETT, J., concur.