Janet C. Kettlewell, Plaintiff-Appellee, v. The Pruden-
tial Insurance Company of America, Defendant-
Appellant.

Gen. No 46,034.

Opinion filed Novem-

ber 30, 1953. Rehearing denied January 11, 1954. Released for publication March 5, 1954.

ECKERT, PETERSON & LEEMING, of Chicago, for appellant; OWEN RALL, WILLIAM A. CANNON, and ROBERT G. SCHLOERB, all of Chicago, of counsel.

FINN, HAYES & SHEHEE, for appellee; RAYMOND F. HAYES, J. GLENN SHEHEE, and JOHN M. BERENT, all of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Janet C. Kettlewell sued the Prudential Insurance Company of America on a policy of insurance on the life of her husband, Norman L. Kettlewell, Jr. She averred the issuance of the policy on May 5, 1948, and the insured's death on November 5, 1948. Defendant, answering, set out a provision of the policy that if the insured, whether sane or insane, shall within two years from the policy date die by suicide, defendant shall be liable only for the return of the amount of premiums actually paid, and alleged that insured's death resulted from suicide within two years from the issuance of the policy and that the premiums received had been tendered to plaintiff and refused. Plaintiff's reply denied that insured's death was the result of suicide. The jury returned a verdict for the plaintiff for $8,118.75. Defendant's motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial were overruled and judgment was entered on the verdict. This appeal followed.

Dr. Norman L. Kettlewell, a 29-year-old practicing dentist in Wilmette, Illinois, was killed on November 5, 1948, at about 8:30 a. m., when he was hit by a northbound Chicago & Northwestern Railroad train at the

Oakwood Avenue crossing in that village. He left plaintiff, his widow, and three children aged four, two and one. A fourth child was born dead about a month before insured's death. He was actively engaged in the practice of his profession during the year preceding his death. During that year he conducted himself well about the house and treated his wife well. They had been married seven and one-half years and their married life was happy. On the morning of the occurrence he was happy, but tired. He and plaintiff had been up most of the night with the children because they all had colds. He and plaintiff got up about 7:15 a. m. She took care of the children. He made his breakfast and asked her if she would be ready to go out to a party that night. She said, "Yes," and in answer to his inquiry stated that she had arranged for a sitter. He asked her whether she wanted cough syrup or cough drops, because the children were sick, and she replied "Cough syrup." He then left the house and that was the last time she saw him alive. He had a 9 o'clock appointment that morning at his office, which was in a separate building on the same lot as their house. He did not have any unusual indebtedness and was able to provide for his family.

Oakwood Avenue runs east and west. Linden Avenue also runs east and west and is about 720 feet north of Oakwood Avenue. The right of way of the Milwaukee Division of the Northwestern Railroad, with one track for northbound traffic and one for southbound traffic, runs through Wilmette in a northerly and southerly direction. Green Bay Road is a four-lane north and south highway, running along the west side of the railroad tracks. Trains going north travel on the west track and trains going south travel on the east track. There is a tower where a towerman works, 360 feet north of the Oakwood Avenue crossing and about 12

302

to 14 feet west of the west rail. The tower is about the same distance south of the Linden Avenue crossing. There is an upstairs room in the tower with windows to the south, north and east, and as the towerman stands in the room he can see in these directions. The trains that pass the tower are either northbound or southbound.

The defendant offered the testimony of the only two eyewitnesses to the occurrence, William Heegeman, the gateman for the railroad, and Andrew Schaft, a truck driver. Heegeman, 68 years of age, had been working at the crossing since 1933. He puts the gates up and down when trains go through. At the point where Oakwood Avenue crosses the railroad right of way, there is room for automobiles to pass. He said: "It is a narrow street but it is a two way drive." There are gates at the crossings on each side of the tracks. One arm of the gate extends over the center of Oakwood Avenue west of the northbound track, and over the walk where pedestrians travel. This walk is immediately to the north of and adjoins the driveway across the tracks. On the morning of the occurrence train 364, southbound, approached the crossing, at which time the gates were down and the electric bell was ringing. Following train 364 and on the same track was a southbound troop train which stopped about 60 feet north of the Oakwood Avenue crossing, awaiting a signal to proceed south. The gates were still down and the electric bell was still ringing. After the troop train got the signal to go and cleared the crossing, Heegeman raised the gates to allow one eastbound and one westbound automobile to pass the Oakwood Avenue crossing. After these automobiles had cleared, he lowered the gates again and put on the electric bell. The reason for lowering the gates after the automobiles had cleared was because he got a signal from the annunciator in his

303

tower room indicating that a northbound train was coming along. This signal comes from some place on the tracks about one and a half miles south of the Oakwood Avenue crossing. The signal starts the annunciator bell ringing as soon as a train passes that point.

Heegeman stated that when he lowered the gates at this time he did not observe anyone at or near the Oakwood Avenue gates. He then directed his attention to the gates at Linden Avenue, 360 feet north of the tower. He put these gates down and looked back to the Oakwood Avenue gates, where he saw a man, the insured, standing on the dirt crosswalk just outside the gates immediately west of the gate and at the side toward Green Bay Road. He looked back toward the Linden Avenue crossing and then again to the Oakwood Avenue crossing and then saw this man standing just inside of the gate at the Oakwood Avenue crosswalk. The electric bell was on. When he saw this man standing inside of the gate he rang his tower bell, which is operated by hand and is about a foot in diameter, so that at this time both the electric bell and the tower bell were ringing. Dr. Kettlewell was standing looking to the south and there was nothing along the crossing or the railroad right of way to obscure a person's vision. The witness said he could see the tracks up to Evanston, the municipality to the south. The west rail of the northbound track was approximately 8 or 9 feet from the arm of the gate that extended over the crosswalk, and it was between this arm and the west rail the man was standing and looking towards the south. The witness stated that when the northbound train was 60 or 70 feet south of the Oakwood Avenue crossing the man took three steps, turned his back to the northbound train, stood between the two rails and pulled his coat up over the back of his head, standing motionless on the track. The train was 10 or 15 feet away from

304

Dr. Kettlewell when he turned and put his back toward it. He pulled his coat up toward the back of his head after he turned his back to the train. The train struck him and hurled him 50 or 60 feet to the west side of the track. The injuries incurred caused his death. Heegeman said that the train was "coming at probably 30, 35 miles an hour. That's about the speed of that train. It doesn't go much faster. It can't." To the question, "Are you positive it couldn't have been going faster?" he answered, "No, sir." The witness stated that it takes about a half a minute to raise the gates at the Oakwood and Linden Avenue crossings and another half a minute to lower both gates. He said, however, that these estimates "were just a guess."

Andrew Schaft, the only other eyewitness, testified that at the time of the occurrence he was driving his truck south on Green Bay Road near the Oakwood Avenue crossing and happened at the time to look toward the northbound track and saw a man standing between the rails of the northbound track opposite Green Bay Road. The man was standing still between the rails with his back toward the south. The witness stated he saw the man standing there between the rails a few seconds or so prior to the impact. He saw the train hit the man, carry him 50 or 60 feet, when he rolled off to the side and onto the ground. He noticed that the gates were down; that the visibility was good at the time; that it was not raining; and that the streets were dry. Joseph Radke testified that at the time of the occurrence he was working at the gas station at the northwest corner of Oakwood Avenue and Green Bay Road. His attention was attracted to the intense loud ringing of the tower bell by the gateman, as well as by the ringing of the electric bell. He looked up to see why the gateman was ringing the tower bell as much as he was and at that time saw a body roll over to the

west of the northbound track. He did not see the train that struck Dr. Kettlewell prior to the impact.

Frank Vantill, called by plaintiff, testified that he was the engineer on the northbound train which struck Dr. Kettlewell. He looked at his speed recorder when he passed the Wilmette tower and he was going between 50 and 55 miles an hour at or near the Oakwood Avenue crossing. When he was south of that intersection he had occasion to look to the north over the tracks and did not see anybody. That morning he sat on the right hand side of the engine in the engineer's seat. He could see straight ahead and to the right. He did not know the train hit a man until he arrived at Kenosha, Wisconsin. He indicated on photographs of the engine by an "x" where he found the rim of glasses and by "xx" where he found a cluster of hair. He said it was dry that morning and that visibility was good. No whistle was sounded from his engine because that was a restricted area. The engine bell was ringing. Kenneth McLean, called by plaintiff, testified that he was the fireman on the train. He was looking ahead when the train was possibly a city block or a block and a half south of the Oakwood Avenue crossing and saw no one. His best judgment was that the train was going about 50 miles an hour. He was working on the left side of the engine cab. When the train was a block or a block and a half south of the Oakwood Avenue crossing his attention was diverted to check the water. He first knew that the train had struck a man when it reached Kenosha. Dr. Thomas A. Carter, called by plaintiff, was the Coroner's physician who examined Dr. Kettlewell's body. He testified to the injuries causing the death and further stated in answer to a hypothetical question that the injuries were received by decedent while he was standing on his feet.

306

Defendant maintains that the unimpeached testimony of the eyewitnesses required the court to direct a verdict for it. In support of the judgment plaintiff points out that a witness may be contradicted or impeached by what he states as well as by adverse testimony. *Kennedy v. Modern Woodmen of America,* 243 Ill. 560, 569. She points out what she terms contradictions and impeachments of Heegeman's testimony. She also discusses the testimony of Schaft, the other eyewitness. Defendant's motion for a directed verdict presented a question of law as to whether, when all the evidence was considered, together with all reasonable inferences from it in its most favorable aspect to the plaintiff, there was a failure to sustain plaintiff's cause of action. Neither the trial court nor this court is permitted to weigh the evidence to determine where the preponderance lies. From the undisputed evidence adduced by the eyewitnesses we are satisfied that the only reasonable conclusion is that Dr. Kettlewell's death was suicidal and not accidental. None of the testimony offered on behalf of the plaintiff throws any light upon the factual situation. The eyewitnesses were disinterested; never knew the insured; fully observed the occurrence; and their testimony stands unimpeached. The absence of proof of motive does not preclude a finding of suicide. It cannot be denied that successful men commit suicide, however unlikely it may appear to their most intimate friends that any such act was contemplated. One person may leave a note indicating such intent; another may not do so. We may never know the reason why the person committed suicide, nevertheless, we are bound to accept that such was the fact where his conduct and actions immediately preceding the tragedy, indicating suicide, have been observed.

Heegeman was in an advantageous position to see and observe Dr. Kettlewell's movements preceding his

307

death. It does not appear that the insured became confused or that he was attempting to get across the track ahead of the approaching train. He saw the insured standing just outside the west gate on the north side of Oakwood Avenue. At that time the gate was down over the north crosswalk and also over the roadway. The electric bell on the south side of Oakwood Avenue was ringing at the time Heegeman first observed the insured and prior thereto and after the insured was seen inside the gate. After seeing Dr. Kettlewell inside the gate Heegeman started operating a hand bell about a foot in diameter. After the insured was standing inside the gate Heegeman observed him looking to the south, from which direction the northbound train was approaching. There was nothing to obscure insured's vision. Heegeman said the property was clear and that he could see the tracks up to Evanston. He then saw Dr. Kettlewell take three steps, which put him in the center between the two rails of the northbound track, after which he turned his back to the oncoming train, pulled his coat up over the back of his head and stood motionless. There is no testimony that insured's vision might have been defective or obscured, that he made any effort to cross the northbound track, or that he stumbled. Assured was familiar with the location as he lived in the vicinity.

Heegeman's testimony as to insured standing motionless with his back to the oncoming train is corroborated by Schaft. From the seat of his truck he saw the man standing in the center of the tracks a few seconds prior to the impact, with his back to the south. The insured was not moving, but was standing still at the time. This witness also testified that the visibility was good and that from his position on the seat of his truck, which was higher than a passenger car, he was able to see the occurrence. Radke who was working at

308

the gas station on the northwest corner of Oakwood Avenue and Green Bay Road, did not witness the impact, but his attention was attracted by the loud ringing of the bell by the gateman. He testified that the tower bell and the electric bells were ringing and that when he looked up he saw a body roll over to the west of the northbound track. We do not find any contradictions or impeachments in the testimony of Heegeman or Schaft. Love of life raises a presumption in the absence of evidence to the contrary that one does not intentionally take his own life, but this presumption is rebuttable and must yield to physical facts clearly inconsistent with it. A verdict cannot rest on mere conjecture or speculation. Everything that Dr. Kettlewell did prior to the impact indicated that he saw the oncoming train. Upon the uncontroverted testimony and circumstances appearing in evidence, the only reasonable conclusion is that Dr. Kettlewell deliberately stood in the track with knowledge of the oncoming train with the intention of suicide. Therefore, the judgment of the superior court of Cook county is reversed and the cause is remanded with directions to enter judgment notwithstanding the verdict in favor of defendant and against plaintiff.

*Judgment reversed and cause remanded with directions.*

NIEMEYER, P. J. and FRIEND, J., concur.