(No. 33196.—

JANET C. KETTLEWELL, Appellant, *vs.* THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee.

*Opinion filed October 25, 1954—Rehearing denied Dec. 20, 1954.*

FINN, HAYES & SHEHEE, of Chicago, (J. GLENN SHEHEE, of counsel,) for appellant.

ECKERT, PETERSON & LOWRY, of Chicago, (OWEN RALL, WILLIAM A. CANNON, and ROBERT G. SCHLOERB, of counsel,) for appellee.

Mr. CHIEF JUSTICE BRISTOW delivered the opinion of the court:

This cause reaches this court as a result of the allowance of plaintiff's petition for leave to appeal from a judgment entered in the Appellate Court, First District. (1 Ill. App. 2d 300, 117 N.E. 2d 568.) There, the plaintiff suffered a reversal of a judgment which she had secured in the superior court of Cook County in the sum of $8118.75.

The defendant-appellee, The Prudential Insurance Company of America, whom we shall hereafter refer to as defendant, wrote a policy of insurance on the life of Norman L. Kettlewell, Jr. The plaintiff-appellant herein was designated the beneficiary. Henceforth we shall refer to her as the plaintiff.

On the morning of November 5, 1948, at 8:30, the insured, Dr. Kettlewell, was killed by a northbound Northwestern passenger train at the Oakwood Street crossing

in the village of Wilmette. The judgment for plaintiff entered herein was predicated upon a life insurance policy which had been issued six months prior to the death of the insured. That contract of insurance provided that if the insured, whether sane or insane, should within two years of the policy date die by suicide, the company would be liable only for the return of the premiums paid. The defendant asserts by way of affirmative defense that Dr. Kettlewell's death was the result of suicide and that consequently plaintiff is not entitled to recover. The jury in the trial court found for the plaintiff, thus rejecting that contention. The Appellate Court reversed this finding, entering judgment for defendant notwithstanding the verdict. The only question before this court is whether the evidence conclusively leads all reasonable minds to an inescapable decision that Dr. Kettlewell took his own life with suicidal intent. There is very little dispute as to the legal principles applicable, and there is practically no conflict in the evidence.

The burden of proving the affirmative defense of suicide is upon the defendant who must prove it by clear and convincing evidence. (Cooley's Briefs on Insurance, 2d ed., 1928, vol. 6, p. 5475.) Judgment notwithstanding the verdict should not be rendered unless the uncontradicted evidence and circumstances preclude any other reasonable conclusion than that death was by suicide. (*Connecticut Life Ins. Co.* v. *Lathrop*, 111 U.S. 612; *Wilkinson* v. *Aetna Ins. Co.* 240 Ill. 205.) The law presumes against death by suicide where circumstances are such that death might have resulted from negligence, accident or suicide. (*Sweeney* v. *Northwestern Mutual Life Ins. Co.* 251 Ill. App. 1, 24; *Knights Templars and Masons Life Indemnity Co.* v. *Crayton*, 209 Ill. 550, 562; *Fidelity and Casualty Co.* v. *Weise*, 182 Ill. 496.) The presumption against death by suicide has probative force and is to be weighed by the jury as evidence in determining the issue of suicide in cases where

the circumstances are consistent with either suicide or accidental or negligent death. 103 A.L.R. 185.

It has been uniformly held that the legal presumption against suicide vanishes when contradictory evidence is produced, and thereafter, the question is to be decided on the evidence without resort to the presumption. (*Guardian Mutual Life Ins. Co.* v. *Hogan,* 80 Ill. 35; *Osborne* v. *Osborne,* 325 Ill. 229.) While the burden of proving suicide is on the defendant, proof of motive is not essential. The legal presumption against suicide does not prevent the entry of judgment notwithstanding the verdict when evidence of suicide is clear.

Having in mind the foregoing, let us consider the factual picture. Dr. Kettlewell was a 29-year-old practicing dentist in Wilmette. He left surviving him his widow, the plaintiff, and three children, ages 4, 2 and 1. A fourth child had been born dead about a month previously. The plaintiff testified that she and the doctor had been married for more than seven years and that very little discord interrupted their happy married life; that on the morning of November 5 he left home about 8:00 A.M.; that he was a little tired because they had been up with the children considerably who were suffering from colds; that he promised to go to the drugstore and procure some cough syrup; that he reminded her that they had a dinner engagement that evening and inquired whether arrangements had been made for a baby sitter; that he had an appointment at his office for 9:00 A.M.; and that he had no unusual indebtedness and provided well for his family.

Oakwood Avenue runs east and west, and Linden Avenue which is about 720 feet north also runs east and west. The right of way of the Milwaukee division of the Northwestern railroad, with one track for north bound traffic and one for south bound traffic, runs through Wilmette in a northerly and southerly direction. Green Bay Road is a four-lane north and south highway, running along the

west side of the railroad tracks. Trains going north travel on the west track and trains going south travel on the east track. Equidistant between Oakwood Avenue and Linden Avenue is a tower house where a signalman is situated who operates the gates and signals mechanically at both Oakwood and Linden Avenue. There is an upstairs room in the tower with windows to the south, north and east, and as the towerman stands in the room he can see without obstruction anything in each direction.

The defendant relies principally upon the testimony of two eyewitnesses, William H. Heegeman, the towerman for the railroad, and Andrew Schaft, a truck driver. Their testimony, if believed by the jury, is highly suggestive of suicide. Heegeman testified that he was 68 years of age and had been in the employ of the railroad at this particular crossing since 1933; that he put the gates up and down when the trains passed by; that Oakwood Avenue where it crosses the railroad right of way has a two-way drive; and that there are gates at the crossing on each side of the tracks, and one arm of the gates extends over to the center of Oakwood Avenue and the other over the walk where pedestrians travel. This walk is immediately to the north of and parallels Oakwood Avenue.

Heegeman also testified to the following: On the morning of the occurrence, train No. 364, southbound, approached the crossing, at which time the gates were down and the electric bell was ringing; and following train No. 364, on the same track, was a south-bound troop train which stopped about 60 feet north of the Oakwood Avenue crossing awaiting a signal to proceed south, and the electric bell was still ringing. After the troop train received the signal to proceed and had cleared the crossing, the gates at Oakwood were raised to allow one east bound and one west bound automobile to pass over the tracks at Oakwood. While the automobiles were passing the annunciator bell rang signifying the approach of a northbound passenger

train, but the operator of the gates was unable to put the gates down as quickly as was his custom, otherwise he would trap the two automobiles on the crossing. In that connection this was Heegeman's testimony: "I dasn't put them down again because the automobiles are crossing. I just can't drop them." Heegeman then turned on the tower bell which was loud and pronounced, and then when the automobiles had cleared, he lowered the gates. When he first lowered the gates he didn't see anyone, and his attention was then directed to Linden Aveune. After putting the gates down there he looked back at Oakwood Avenue where he saw a man, the insured, standing on the crosswalk just outside the gates immediately west of the gate and on the side toward Green Bay Road. He again looked back toward Linden Avenue crossing and then again at the Oakwood crossing when he saw this man standing just inside of the gate at the crosswalk. At the time of the occurrence in question both the electric bell and the tower bell were ringing, and Dr. Kettlewell was standing looking to the south and there was nothing along the crossing or railroad right of way to obscure his vision. When the northbound train was 60 or 70 feet south of Oakwood Avenue the man took three steps, turned his back to the northbound train, stood between the two rails of the northbound tracks and pulled his coat up over the back of his head standing motionless on the track, the train being 10 or 15 feet away from Dr. Kettelewell when he turned his back toward it. The train struck him and threw him 50 to 60 feet north and west of the track. The train was coming 30 to 35 miles an hour. "That's about the speed of that train. It doesn't go much faster, it can't."

Andrew Schaft, the other eyewitness, testified that at the time of the occurrence he was driving his truck south on Green Bay Road near the Oakwood Avenue crossing; that he happened to see the man standing between the rails of the northbound track opposite Green Bay Road and that

his back was to the south; that he saw the train hit him and throw him 50 or 60 feet to the north and west of the track; that the gates were down; and that the visibility was good and the streets were dry.

Joseph Radke testified that at the time of the occurrence he was employed at the gas station at the northwest corner of Oakwood Avenue and Green Bay Road. His attention was attracted to the intense loud ringing of the tower bell by the gateman, and he looked up to see why the gateman was ringing the tower bell so vehemently and at the time saw a body roll over to the west.

Frank Vantill testified that he was the engineer on the train that struck Dr. Kettlewell, and he did not know that he had struck him until he arrived at Kenosha, Wisconsin; that the train was traveling between 50 and 55 miles per hour as it went through Wilmette; that he has a recorder on the engine which indicates the speed; that he was traveling slowly because this was a restricted speed area. Kenneth McLean, the fireman, was also called by the plaintiff, and he testified that he did not see Dr. Kettlewell and did not know about the accident until their train had arrived at Kenosha, Wisconsin, and in his judgment the train was traveling 55 miles per hour.

Dr. Thomas A. Carter was the coroner's physician who examined Dr. Kettlewell's body. He testified that it was his opinion that Dr. Kettlewell was standing on his feet when he was struck, and he also stated that his examination revealed no broken bones in the spinal column of Dr. Kettlewell. "I examined the back of Dr. Kettlewell. The spine was negative as to injuries."

The defendant made an unimpressive effort to develop testimony that would provide a motive for suicide. About six months previously the doctor had been drinking too heavily, and on one occasion he became involved in a tavern brawl and was hospitalized for several days as a result of injuries sustained on that occasion to his hand.

His widow said that she had had a few quarrels with him because of his excessive drinking, but for several months prior to his death his intemperance had disappeared. It was also suggested that the doctor was unduly despondent because of the loss of their fourth child. The widow explained that her husband was grief stricken and sad and did much to console her but implied that he was not so emotionally disturbed that he would be moved to take his life. It was also hinted that the insured was beset with financial difficulties. Suffice it to say that these were trivial and would scarcely drive one to suicide. He had a mortgage on his home that amounted to something less than $1400 and there were several unpaid bills for his office furniture and dental supplies but these were not large either.

Priscilla Lawrence, plaintiff's sister, and her husband, Marion Lawrence, residents of Peoria, were in the Kettlewell home for several days prior to November 5. Their testimony revealed a happy and pleasant husband and father, busy with his profession and contented at home. Arthur R. Weir, who lived only two doors away from the doctor, testified that he had visited in the doctor's home many, many times during the past year—played golf with him frequently and, particularly during the week prior to November 5, had assisted him in laying an asphalt tile floor in the kitchen; that the doctor and he had fun in doing so; and that the doctor was happily contemplating some repairs to the attic; and that he rendered this assistance without pay as a neighborly gesture.

A verdict should be directed for the defendant only where the reasonable conclusion from the undisputed evidence is· that death resulted from suicide and not from an accident. The three cases cited by defendant in support of the Appellate Court's conclusion that a directed verdict for the defendant in the instant case would have been proper are *Bernick* v. *Ill. Commercial Men's Assoc.* 175 Ill. App. 511; *Mason* v. *Supreme Court of Honor,* 109 Ill.

App. 10; *Knapczyk* v. *Metropolitan Life Ins. Co.* 321 Ill. App. 611. In the *Bernick case* the insured was found lying partly on a bed in his hotel room, his right hand grasping the butt of a revolver which had discharged one cartridge and the fingers of his right hand were slowly relaxing. A bullet had entered the insured's right temple which was seared and powder burned. The occurrence happened in a locked room with no one else present. The court therein said: "Upon the uncontroverted evidence and circumstances appearing in evidence the only reasonable conclusion to be adduced was the injury that caused the death of the insured was self inflicted and not accidental." In the *Mason case* there was clear proof of deliberate intention and preparation for suicide. In the *Knapczyk case* the trial court permitted the jury to pass upon the suicide issue and the Appellate Court reversed, holding as here, "Upon a careful consideration of all the evidence we are of the opinion that the only reasonable conclusion to be drawn from the facts before us is that the insured died from a wound self inflicted and that a verdict for the defendant should have been directed." Quoting from the opinion reciting the facts in that case the court said: "Several hours later his body [the insured's body] was found in the garage in the rear of the building in which he lived, lying upon newspapers appearing to be freshly laid upon the concrete floor; all the doors of the garage were closed and the windows had been nailed down so that they would not be opened; there was no evidence of any struggle or violence; · the bullet which caused the death was fired from a revolver held so close to the body as to cause a powder burn on the leather jacket; an expelled cartridge was lying near the revolver; the money in his clothes was not disturbed; no reason was disclosed why the insured should be in the garage—his car was not kept there; the position of the body, the undisturbed newspapers and clothes preclude the possibility of an accidental shooting; the only

other hypothesis inconsistent with suicide is that he may have been shot elsewhere and his body carried to the garage."

Another case cited by defendant is *Equitable Life Assurance Soc.* v. *Guiou,* 86 Fed. 2d 865 (CCA. 8th 1936). It demonstrates the character of the proof present when suicide was held to be the only reasonable hypothesis. The insured was walking up and down in the railroad yards where he had no business, was crossing a viaduct, climbed over the guard rail, and plunged 32 feet below onto a concrete walk.

The facts in the above cases are obviously not remotely similar to those in the case before us. In passing upon the propriety of the Appellate Court's determination in the instant case, we must bear in mind that the uncontradicted evidence in this record should be viewed in its most favorable light, giving the plaintiff the benefit of all reasonable intendments and inferences. The trial court ruled that there was properly an issue of fact to be submitted to the jury, namely, Was Dr. Kettlewell's death the result of self-destruction? It is the contention of the defendant and the holding of the Appellate Court that the unimpeached testimony of Heegeman and Schaft clearly and completely removed any doubt on that issue. It is the plaintiff's contention that the testimony of those two witnesses should not be so construed, that it was the prerogative of the jury to adjudge the credibility of Heegeman and Schaft and decide the factual issue of suicide. Heegeman testified to one fact that was highly suggestive of suicide, that is, that just prior to being struck by the engine the doctor turned his back to the oncoming train and pulled his coat over his head. It is significant to note that the other eyewitness, Schaft, the truck driver, although he saw the entire occurrence, did not observe this important circumstance. Could it be that Heegeman was mistaken or was not telling the truth about this detail? Heegeman also

testified that the train in question was traveling 30 to 35 miles per hour. The engineer on the same train testified that the recorder on the engine showed his speed to be 50 to 55 miles per hour. Heegeman also testified that the train could not go any faster than 30 to 35 miles per hour, but the engineer said that when he was traveling through Wilmette at 50 to 55 miles per hour he was going slowly because it was a restricted area. Heegeman surely knew better because he had worked in that very same tower for something like twenty years. The jury and the trial judge watching and studying every expression and action on the part of the witnesses were in a better position to adjudge their credibility than a reviewing court who has only the printed page to rely upon. Heegeman may have so demeaned himself in the courtroom or on the witness stand that his testimony was not worthy of belief. The reviewing court should not overlook the valuable function of the jury in our judicial administration. The language in the opinion of the Missouri court in *Creamer v. Bivert*, 214 Mo. 473, 113 S.W. 1118, is strikingly appropriate. "He [trial court] sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson or the itching over-eagerness of the swift witness, as well as honest fact of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in

print, here, as if falling from the lips of an angel of light and yet not a soul who heard it, *nisi,* believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify."

Joseph Radke, the witness who was employed at the filling station on the northwest corner of Green Bay Road and Oakwood Avenue saw nothing of the occurrence at the railroad crossing. Radke's attention was diverted from the railroad crossing to the gate shanty where the emergency bell was ringing with unusual loudness, for, as he said, "It just seemed to be more pronounced." Could it be that Dr. Kettlewell was attracted by that same unusual sound and that was the occasion for his turning to the north? Could it be that the two automobiles passing over the Oakwood crossing momentarily prevented his seeing the oncoming trains? With some plausibility the plaintiff argues that the deceased did not adopt the usual method of self-destruction when a moving locomotive is the instrument of death, namely, the doctor did not frantically dive into the path of the engine. It is also argued that it is reasonable to infer that as soon as the doctor realized that disaster was inevitable, that he impulsively shrugged his shoulders which was a natural reflex motion under the circumstances. Could it be that Heegeman's eagerness to lend support to the suicide theory stems from his desire for exculpation. He may have felt that some blame could be attached to his act of permitting automobiles to pass over the Oakwood crossing at a time when he knew or should have known that a passenger train was due. Heegeman also testified that Dr. Kettlewell was standing to the west of the northbound tracks when the train was only 60 to 70 feet away. A moving object traveling 55 miles per hour will traverse 80 feet in a second. Consequently, less than one second of time intervened while

the doctor walked three steps, turned to the north and pulled his coat up over his head. Our analysis of the facts before us reveals that this is not a case where all reasonable minds should conclude that Dr. Kettlewell committed suicide. This is obviously not another *Bernick case* where the insured was found locked in his bedroom, all alone, lying dead on his bed still cutching the revolver from which came the bullet that entered his temple and leaving powder burns. Nor is it remotely similar to the *Equitable Life case* where the deceased plunged to his death from an elevated viaduct.

The jury in this case could reasonably infer from the facts appearing in this record that the doctor met his death as a result of accident or gross carelessness. The plaintiff is entitled to the benefit of such an inference. The record is devoid of any proof that Dr. Kettlewell was desirous of abandoning life leaving behind him a happy home, a wife and three children and a successful professional career. He was a good husband and a good father. There was nothing in the evidence that would indicate that he did not enjoy all the natural instincts of self-preservation to avoid injury and death. The evidence here is clearly consistent with an hypothesis of death by accident or carelessness. Reasonable minds could conclude that this pedestrian had no suicidal intent. Twelve jurors who saw and heard the witnesses decided it was not suicide. The trial court who saw and heard the witnesses approved this finding. The Appellate Court was clearly in error in substituting its judgment for that of the trial court. The judgment of the Appellate Court entered herein is reversed and the cause is remanded to that court, with directions to pass upon other assignments of error.

*Reversed and remanded, with directions.*